IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 3:19-CR-112-K |
| CENGIZ JAN COMU | |

**DEFENDANT'S OPPOSED MOTION FOR RECONSIDERATION OF ORDER OF DETENTION AND FINDINGS MADE IN SUPPORT THEREOF**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW the Defendant, Cengiz Jan Comu, and respectfully submits this Opposed Motion for Reconsideration of Order of Detention and Findings Made in Support Thereof, and in support would show the Court as follows:

**I.**
**Introduction**

The Defendant files this Motion for Reconsideration in accordance with the accepted legal principle that although such motions "are nowhere explicitly authorized in the Federal Rules of Criminal Procedure, they are a recognized legitimate procedural device." *United States v. Williams*, No. 3:19-CR-159-S, 2019 WL 2161648 at *2 (N.D. Tex. May 16, 2019). As the Fifth Circuit has observed, courts have "continuing jurisdiction over criminal cases and are free to reconsider [their] earlier decisions." *United States v. Scott*, 524 F.2d 465, 467 (5th Cir. 1975). Furthermore, the Fifth Circuit has likewise explained that a "trial court is free to reconsider and reverse any interlocutory order or decision for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or clarification of the substantive law." *Austin v. Kroger Texas, L.P.*, 864 F.3d 326, 336 (5th Cir. 2017). As such, "the courts' inherent power to

Defendant's Opposed Motion for Reconsideration of Order of Detention
and Findings Made in Support Thereof
Page 1 of 18

provide relief from interlocutory orders and decisions 'as justice requires' ... appears applicable in the context of a motion to reconsider a detention order." *Williams*, No. 3:19-CR-159-S at *2. Consistent with the foregoing applicable legal principles, and for the reasons set forth below, the Defendant respectfully requests that the Court reconsider the order of detention (and findings in support thereof) previously entered in this case.

## II.
## Relevant Background

At the hearing on the Government's Ex Parte Motion to Revoke the Pretrial Release of Defendant Cengiz Jan Comu (hereafter "Government's Motion"), the Government presented evidence that the Defendant had communicated with an individual by the name of Nick Mysore (hereafter "Mysore") regarding Mysore's potential interest in trying to acquire EarthWater and attempt to get it back into operation. In connection with these discussions, an unexecuted, draft version of a document titled "Confidential Letter of Intent & Term Sheet" (hereafter "Letter of Intent") was exchanged between the Defendant and Mysore. These facts are not disputed, nor is the fact that this Letter of Intent was never executed or otherwise entered into by the Defendant or Mysore. What remains very much contested, however, is the nature and proper classification of the Letter of Intent and the Defendant's conduct with respect thereto.

At the conclusion of the hearing, the Court made a finding that "the documents indicate that Mr. Comu was certainly involved in advising on the purchase or sale of securities." Transcript, at 80, lines 12-14 (ECF No. 140). Likewise, in the Court's subsequent written Order, the Court further stated that the "terms of the LOIs establish by clear and convincing evidence that Defendant was advising on the purchase and sale of EarthWater securities." Order, at 5 (ECF No. 136). Based upon these findings by the Court that the Defendant violated his conditions of release by advising

Defendant's Opposed Motion for Reconsideration of Order of Detention
and Findings Made in Support Thereof
Page 2 of 18

on the sale or purchase of securities, the Court revoked the Defendant's pretrial release. Further, the Court found that the Defendant would be unlikely to abide by any conditions, based upon the fact that he "was not forthcoming with information to the government about the proposed transactions," and that his "conduct appears to be part of a pattern of disregard for court orders and the judicial process." *Id.* at 6. For the reasons set forth below, the Defendant respectfully requests that this Honorable Court reconsider its Order of detention and findings in support thereof, namely that the Defendant's conduct constituted a violation of his conditions of release and that he is unlikely to abide by any conditions.

### III.
### Defendant's Conduct Did Not Constitute a Violation of His Conditions

In order to determine the critical issue in this case (whether the Defendant violated his conditions of release by "advising on the purchase or sale of securities"), it is crucial to first define and understand that language with the greatest possible precision. While the Defendant certainly recognizes the Court's position that a "fully-consummated sale of securities was not required to violate his conditions," the Defendant respectfully submits that there must at least be a showing of a potential sale of securities, *i.e.* a contract for the sale of securities, even if not fully-consummated. In other words, while the violative nature of conduct consisting of "advising" with respect to a contemplated transaction is not dependent on the transaction's status as having been "fully-consummated," it *is dependent* on the transaction having contemplated a sale of securities. As such, the Defendant's conduct in connection with the Letter of Intent, even if found to constitute "advising," was not "advising *on the purchase or sale of securities*," and therefore did not amount to a violation of his conditions of release.

Defendant's Opposed Motion for Reconsideration of Order of Detention
and Findings Made in Support Thereof
Page 3 of 18

A. **Relevant Legal Definitions**

To that end, a review of the prolific securities case law dealing with Section 10(b) of the 1934 Act and Rule 10b-5 proves instructive, given that these cases routinely analyze the threshold determination of whether certain conduct was committed "in connection with the purchase or sale of any security." 15 U.S.C. § 78j(b). In this context, the term "purchase" is defined as "any contract to buy, purchase, or otherwise acquire," and the term "sale" is defined as "any contract to sell or otherwise dispose of." 15 U.S.C. § 78c(a)(13)-(14) (1981). Additionally, the definition of the term "security" includes, in relevant part, any "investment contract." 15 U.S.C. § 78c(a)(10) (1981). While these terms are to be "broadly construed" and "not limited to their common-law meaning," the court does not "possess license to strip the statutory words 'purchases' or 'sale' of their core meaning in an attempt to create a purchase or sale by judicial fiat." *Southwest Realty, Ltd. v. Daseke*, No. CA3-89-3055-D, 1990 WL 85921 at * 6 (N.D. Tex. May 9, 1990) (internal quotation marks omitted). In order to determine whether the Defendant's conduct constituted "advising *on the purchase or sale of securities*," we must analyze said conduct within this framework.

Namely, we must first address the critical threshold inquiry – that is, whether the Letter of Intent constituted an investment contract, such that it would fall within the definition of a security. This inquiry is of manifest importance, given that the prohibited actions (promoting or advising) are prohibited only to the extent that they do so "on the purchase or sale of securities." Without the existence of a security, then, there can be no violation. In *Southwest Realty*, an opinion issued by the U.S. District Court of the Northern District of Texas, a very similar set of facts was analyzed in the context of securities law, specifically considering whether the conduct at issue therein had been committed in connection with the purchase or sale of any security. *See id.* at *6. In that case,

Defendant's Opposed Motion for Reconsideration of Order of Detention
and Findings Made in Support Thereof
Page 4 of 18

the court observed that the "ultimately dispositive question [t]here [wa]s whether the March 7, 1988 letter of intent constituted a contract for the sale of securities." *Id.*

In analyzing this issue, the court observed that numerous other courts considering this question "have concluded that a letter of intent setting forth the parties' intended agreement does not constitute a contract for the sale of securities for purposes of federal securities laws." *See, e.g., Portnoy v. Revlon, Inc.*, 650 F.2d 895, 899 (7th Cir. 1981) (letter of intent fell short of establishing binding commitment; securities claims dismissed); *Southeastern Waste Treatment, Inc. v. Chem–Nuclear Systems, Inc.*, 506 F.Supp. 944, 948–49 (N.D. Ga. 1980) (letter of intent did not create contract between parties; securities claims dismissed); *Dunhill Sec. Corp. v. Microthermal Applications, Inc.*, 308 F.Supp. 195, 197–98 (S.D.N.Y. 1969) (letter of intent regarding proposed public offering did not bind parties); *cf. Southmark Corp. v. Life Inv., Inc.*, 851 F.2d 763, 766–68 & n. 7 (5th Cir. 1988) ("Memorandum of Understanding" and "notification letter" between buyer and seller of stock not sufficient to create a contract); *Northland Capital Corp. v. Silver*, 735 F.2d 1421, 1427–29 (D.C. Cir. 1984) (letter agreement not sufficient to establish existence of contract absent formal closing of deal).

In addition to the guidance offered by these decisions, the court made note of the fact that the "letter of intent was expressly made subject to the final legal documentation for the rights offering, ... listed numerous conditions necessary to a final agreement, and [wa]s couched in terms of what the parties 'would' agree to do." *Southwest Realty*, No. CA3-89-3055-D at *6. Further, the court pointed out that because "the rights offering never came to fruition, many of the conditions never occurred." *Id.* "At most, the letter of intent reflected the parties' agreement to use their best efforts to complete the deal." *Id.* For these reasons, the court found that the "letter of

Defendant's Opposed Motion for Reconsideration of Order of Detention
and Findings Made in Support Thereof
Page 5 of 18

intent *did not constitute a contract for the sale of securities*," and thus that no claims "in connection with the purchase or sale of a security" could arise therefrom. *Id.* (emphasis added).

The Letter of Intent at issue here possesses all the same characteristics which were found to be significant by the court in *Southwest Realty*, namely the qualified, conditional nature of its provisions and the need for additional future transactions before the ultimately contemplated sale of securities could occur. Just as in that case, the Letter of Intent at issue here "listed numerous conditions necessary to a final agreement, and [wa]s couched in terms of what the parties 'would' agree to do." *Id.* As a result, despite contemplating that a proposed offering of securities might potentially occur if and when certain subsequent, additional agreements were entered into, the Letter of Intent itself "did not bind either party to the proposed [] offering, [and thus] did not constitute a contract for the sale of securities." *Id.*

In fact, the circumstances at hand arguably present an even stronger basis upon which to conclude that no securities were involved, to the extent that not even the Letter of Intent (much less the further agreements contemplated therein) was ever executed in this case. In another opinion addressing the issue of whether certain conduct was committed "in connection with the purchase or sale of any security," the D.C. Circuit Court of Appeals analyzed a factually similar situation. Specifically, the parties in that case had "prepared a memorandum describing the proposed investment," "sent the memorandum to a variety of [potentially interested parties]," and drafted an "agreement letter" which set forth the drafting party's understanding of the terms of the contemplated transaction, among other actions "in the course of *attempting* to negotiate and close a deal." *Northland Capital Corp.*, 735 F.2d at 1423–24, 31 (emphasis in original). Despite the fact that these negotiations were aiming to complete the first piece of multi-phase transaction that ultimately contemplated a future sale of securities, the court found that said facts "simply do not

Defendant's Opposed Motion for Reconsideration of Order of Detention
and Findings Made in Support Thereof
Page 6 of 18

constitute the purchase or sale of securities," where the documents "plainly contemplated both a closing and a transaction with a group of investors," – two subsequent, future requirements which would have to occur in order to give rise to the ultimately contemplated sale of securities. As such, the court affirmed the lower court's finding that the plaintiff "was not a purchaser of securities, inasmuch as [the parties] never came to a meeting of the minds with respect to the purchase of the securities in question," and therefore that the plaintiff could not satisfy the "requirement that the fraud be in connection with the purchase or sale of any securities." *Northland Capital Corp.*, 735 F.2d at 1422.

Furthermore, even if the Mysore Letter of Intent had been consummated, it still would not have resulted in a sale of securities, and thus cannot be said to constitute a contract for the sale of securities.[1] *See Southwest Realty, Ltd.*, at *6 (Where agreement "contemplated the existence of future transactions" before the proposed offering could occur, it "did not bind either party to the proposed rights offering," and "did not constitute a contract for the sale of securities.") Accordingly, the status of the transaction as being "fully-consummated" or otherwise has no effect on the critical question – whether the contemplated (and potentially unconsummated) transaction was one for the purchase or sale of securities.

For the same reasons, it is evident that the Shields Letter of Intent likewise did not constitute a contract for the sale of securities. Thus, the fact that it was executed by the parties does not somehow transform it from a mere Letter of Intent, outlining non-binding terms for a potential

---

[1] Any potential sale of securities, as described by the terms of the Letter of Intent, could only have occurred subject to and as a result of the "execution of definitive agreements by the Parties." Letter of Intent, at 1. As such, it would be those subsequent, future "definitive agreements" which would constitute the contract for the sale of securities, if any were to ultimately arise from the proposed transaction.

Defendant's Opposed Motion for Reconsideration of Order of Detention
and Findings Made in Support Thereof
Page 7 of 18

transaction expressly conditioned upon the execution of subsequent binding agreements, into an actual contract for the sale of securities, the execution of which would actually result in a binding sale of securities, without the need for any subsequent or future agreements or occurrences. Therefore, much like the Mysore Letter of Intent, the Shields Letter of Intent is similarly incapable of giving rise to potential violations of the Defendant's conditions of release, even to the extent that the Defendant's actions in connection therewith could be construed as "advising."

Just as in the above-cited cases, the Defendant and Mysore never came to a meeting of the minds, never entered into a binding agreement, and most critically of all, never conducted a sale of securities. The interaction between them consisted of preliminary negotiations, at best, but even if the Letter of Intent had been entered into, its terms were such that it would still not have constituted a contract for the sale of securities even if executed. In short, the act of "advising" with respect to a transaction which does not occur in connection with a sale of securities (whether such sale is fully-consummated or merely would be the result of executing the contract for the sale of securities which is the subject of the transaction) does amount to a violation of the Defendant's conditions of release.

**B. No Evidence of "Advising"**

Additionally, the evidence does not show that the Defendant advised Mysore with respect to the potential sale or purchase of securities. The Defendant did not set out a plan for how to go about attempting to conduct the capital raises mentioned in the Letter of Intent. Nor did he counsel Mysore as to the relative benefits or detriments which the proposed draft Letter of Intent might ultimately have on Mysore. Rather, Mysore appears to have been more than capable of conducting the negotiations without any advice or guidance from the Defendant. As the Court aptly pointed out in its Order, "Mysore countered Defendant's proposed LOI with his own proposed Non-

Defendant's Opposed Motion for Reconsideration of Order of Detention
and Findings Made in Support Thereof
Page 8 of 18

Binding Letter of Intent that contemplated a vastly different arrangement." Order, at 4, n.1 (ECF No. 136). As such, the evidence demonstrates that the Defendant was not acting as an advisor, but merely as an arms-length, effectively adverse party in a preliminary stage of negotiations. Particularly as here, where the parties' interests clearly differed in substantial respects, it would be highly unusual for the Defendant to have been "advising" Mysore in any sense of the word, with respect to the negotiations between them.

Further, with respect to the Court's finding that the "terms of these LOIs establish by clear and convincing evidence that Defendant was advising on the purchase and sale of EarthWater securities," the Defendant would respectfully note that the terms cited by the Court in connection with said finding were not drafted by the Defendant, but rather by members of the Shields Law Group, with revisions and input from Larry Friedman (EarthWater's then corporate counsel). Order, at 5 (ECF No. 136). In fact, the Defendant did not so much as propose these terms in the Shields transaction, which was negotiated entirely by Mr. Friedman on EarthWater's behalf. Thus, with respect to the terms in question, the Defendant did not play any role as to the Shields transaction, and with respect to the Mysore negotiations, his role was limited to passing these terms on to Mysore as a potential starting point for their negotiations. In light of that fact, even to the extent that these terms constituted "advice" from any party, they would have been the advice of the Shields Law Group, not of the Defendant.

For these reasons, the Defendant respectfully requests that the Court enter a revised order finding that the Defendant's conduct did not, as a matter of law, constitute a violation of his conditions of release, and authorizing his release pending trial, subject to any appropriate conditions of release.

Defendant's Opposed Motion for Reconsideration of Order of Detention
and Findings Made in Support Thereof
Page 9 of 18

## IV.
## <u>Available Conditions of Release Can Ensure Public Safety</u>

To the extent that the Court upholds its original finding that the Defendant's conduct constituted a violation of his conditions of release, the Defendant respectfully submits that there are conditions sufficient to ensure both the Defendant's appearance and the safety of the public. This holds particularly true in light of the fact that the Court's directive is to "impose conditions that will reasonably assure—not guarantee—the appearance of the person as required and the safety of any other person and the community." *See United States v. Fortna*, 769 F.3d 243, 250 (5th Cir. 1985). For the reasons set forth below, the Defendant respectfully submits that the conditions proposed herein are sufficient to reasonably assure the Defendant's appearance and the safety of the public.

A. **Despite the Government's Unsupported Arguments to the Contrary, the Defendant Has Shown That He is Likely to Abide by Any Conditions Imposed**

As a major facet of its argument that the Defendant is unlikely to abide by any conditions of release, the Government has repeatedly pointed to a nearly thirty-year-old SEC Order which prohibits the Defendant from selling unregistered securities. Further, the Government has repeatedly argued that this Order, when considered in connection with the Defendant's bankruptcy proceedings, establishes a pattern of disregard for court orders and judicial process. What the Government has not argued, however, is how or when the Defendant has allegedly *violated* this 1989 Order. In fact, there has not been any evidence presented which would establish that the Defendant has sold unregistered securities in violation of that Order. As such, it is improper for the Government to repeatedly assert that the mere existence of this Order somehow establishes a pattern of disregard for court authority. Without a violation of the Order, there is no showing of disregard for its authority. And to the extent that the Government may attempt to claim that the

Defendant's Opposed Motion for Reconsideration of Order of Detention
and Findings Made in Support Thereof
Page 10 of 18

allegations of the indictment demonstrate disregard for the Order, any such argument would be unavailing, given that unproven allegations in an indictment are not evidence. Based on the fact that there is no evidence before the Court that the Defendant has sold unregistered securities in violation of the SEC Order, its existence should not be relied on as a basis to assert that the Defendant has displayed a pattern of disregard for court authority.

To the same end, the much more recent – and much more relevant – pattern of conduct, *i.e.* his conduct while on pretrial release in this case offers many examples of the Defendant's compliance with the Court's Orders. Namely, the Defendant's conduct while on pretrial release in this case offers many examples of his compliance with the Court's Orders. Of course, the conduct at issue here (as the rulings currently stand) has been found to constitute a violation of the Defendant's conditions. And while that ruling may well be upheld, the Defendant submits that the crucial aspect of that conduct (with respect to the determination of whether the Defendant is likely to abide by conditions) is whether he believed his actions to be in compliance with his conditions. Regardless of whether the conduct ultimately proved to be a violation, it would be illogical to conclude that such conduct demonstrated a disregard for the Court's authority if, albeit incorrectly, the Defendant engaged in the conduct believing it to be compliant with the terms of his release. As argued at the hearing and in the Defendant's Response to the Government's Motion, the Defendant did not view the Letter of Intent and related discussions to be a violation of his conditions. As such, his misunderstanding and/or incorrect interpretation of his special conditions of release should not be used as a basis on which to conclude that he has shown a disregard for court authority or that he is unlikely to abide by any conditions.

Likewise, the Defendant's belief that he was not violating his conditions of release is a fact of vital importance when considering the Court's observation that he "should have disclosed his

Defendant's Opposed Motion for Reconsideration of Order of Detention
and Findings Made in Support Thereof
Page 11 of 18

activities to his supervising officer because they affected a condition of his release." Order, at 6 (ECF No. 13). Just as with respect to the Defendant's alleged pattern of disregard for court authority, the fact that he did not affirmatively disclose this conduct to his supervising officer establishes a wrongful intent only to the extent that he believed it to be affecting his conditions of release, and therefore subject to disclosure. With regard to the terms of the proposed transaction, the Defendant likewise saw nothing improper about leaving disclosure of the transaction up to the discretion of NEWCO, given his belief that his role in negotiating a potential Letter of Intent did not constitute a violation.

Notably, this belief was reinforced by the fact that the Government did not raise any issue of a potential violation of his conditions of release in response to the Shields Letter of Intent, even after being advised of that document and engaging in discussion with the Shields Legal Team specifically pertaining to that proposed transaction. The Defendant knew that the Government had knowledge of the Shields transaction in June 2019, and he further knew that they took no action in response. The logical inference from those facts is that there simply was no "action" for the Government take, as the conduct did not constitute a violation. Considering these actions in context, it becomes evident that, to the extent the Defendant was not forthcoming regarding the transaction, such conduct was not committed with a wrongful intent, but rather as the result of his inaccurate belief that his conduct was not in violation of his conditions.

Additionally, with respect to all of the other, much more straight-forward, conditions of his release, Defendant has shown his intent and desire to abide by the Court's Order through his constant and careful compliance with said conditions. There have not been any issues or alleged violations of any of the more standard conditions, including his geographic restrictions, his curfew, or his attendance and participation in any meetings scheduled by his supervising officer, USPO

Defendant's Opposed Motion for Reconsideration of Order of Detention
and Findings Made in Support Thereof
Page 12 of 18

Lisa Evans. And despite the Government's unsupported allegations, there has been no evidence presented that he has violated the other special condition prohibiting him from having contact with any co-defendants or potential witnesses in this matter. Importantly, there has been no showing that he has violated any condition other than the one at issue, which is undoubtedly the one condition that is most subject to interpretation. In sum, the Defendant's compliance with each of the "black and white" conditions provides support for the fact that he does not have a general disregard for the Court's authority and is not unlikely to abide by any conditions.

### B. Sufficient Conditions Exist

Consistent with the foregoing discussion, the Defendant respectfully submits that there are conditions sufficient to reasonably assure his appearance and the safety of the public, as set forth below. Accordingly, the Defendant respectfully requests that the Court revoke the Order of Detention previously entered and release the Defendant pending trial, subject to the following supplemental conditions (or such other conditions as the Court deems necessary and appropriate):

1. Resignation – The Defendant hereby tenders his resignation from his former roles as Chairman and CEO of EarthWater, Ltd., which became effective immediately upon the execution of same. *See* Exhibit 1; and

2. Home Detention – The Defendant shall be subject to Home Detention, restricting him to the confines of his residence at all times except for employment; religious services; medical, substance abuse, or mental health treatment; attorney visits; court appearances; court-ordered obligations; or other activities approved in advance by the pretrial office or supervising officer.

In this case, allowing the Defendant to be released pending trial, subject to the above supplemental conditions, would best achieve the mandate of 18 U.S.C. § 3142 to ascertain and "impose the least restrictive combination of conditions that the court determines will reasonably assure [a defendant's] appearance as required and the safety of any other person and the community." *United States v. Barker*, 3:16-CR-516-D, 2017 WL 345643, at *13 (N.D. Tex. Jan.

Defendant's Opposed Motion for Reconsideration of Order of Detention
and Findings Made in Support Thereof
Page 13 of 18

24, 2017). After all, the standard is not that the conditions must *guarantee* the Defendant's appearance and safety of the public, but rather that the conditions must *reasonably assure* his appearance and the safety of the public. *See Fortna* 769 F.3d at 250.

Under the unique circumstances of this case, the conditions contemplated above will be sufficient to reasonably assure these goals. By tendering his resignation from his former roles at EarthWater, the Defendant has fully surrendered any and all authority to affect any action relating in any way to EarthWater's affairs, thereby completely "divorcing" himself from EarthWater.[2] These facts constitute significantly changed circumstances from the facts which were before the Court at the hearing on the Government's Motion. To the extent that the Court inquired of the Defendant during the hearing whether he was truly willing to resign at that point in time, the Defendant submits the attached resignation as further support for his representation to the Court at the hearing that he was, indeed, ready and willing to do so. *See* Exhibit 1.

Importantly, the Defendant's problematic conduct stemmed entirely from his desire to try and "revive" EarthWater. Despite the Government's unsupported allegations, there has been no evidence, whatsoever, of any potentially violative conduct outside the confines of the Defendant's efforts with respect to EarthWater. Now that this motivation has been eliminated, any perceived

---

[2] The Defendant respectfully submits that a clarification is necessary with regard to the following observation made by the Court in its Order:

> It was not until the government sought to revoke his release for attempting to structure a transaction that would require the creation of a new class of EarthWater stock and promotion of that stock to EarthWater investors—potential victims of Defendant's alleged crime—did Defendant assert that he could not continue as CEO without violating his conditions of release.

Order, at 6, n.2 (ECF No. 136). Specifically, the Defendant would respectfully submit that the Defendant did, in fact, raise this issue as early as May 2019 in his Sealed Opposed Motion to Modify Conditions of Release and Request for Expedited Hearing (ECF No. 48). Although the Defendant did ultimately modify its requests, based on the position taken by the Government in response, the issue of the Defendant's ability to carry out his "ongoing duties and obligations" as "Chairman and CEO" was nonetheless raised in that Motion. *Id*. at 1.

Defendant's Opposed Motion for Reconsideration of Order of Detention
and Findings Made in Support Thereof
Page 14 of 18

risk in that regard which may have existed at the time of the hearing has been ameliorated and is thus no longer applicable.

In short, the Defendant submits that the very conditions posed by the Court during the hearing (*i.e.* that the Defendant resign from his roles and "completely divorce from EarthWater") would be sufficient here to satisfy the requirements of Section 3142. Accordingly, pretrial release subject to appropriate conditions would be most consistent with the mandate of 18 U.S.C. § 3142(e) that only when "no combination of conditions can reasonably assure the appearance of the [defendant] and the safety of the community shall" the defendant be detained pending trial. 18 U.S.C. § 3142(e).

## V.
### The Defendant's Current Medical Condition Constitutes a Material Change of Circumstances Which Argues in Favor of Release

Finally, the Defendant would respectfully submit one additional material change of circumstances in further support of the foregoing Motion for Reconsideration; namely the Defendant's need for continuing expert medical care. Specifically, the Defendant suffers from continued complications stemming from a severe impact injury to his right eye which occurred in March 2018, requiring him to undergo a total of six separate eye surgeries to date since that accident. On October 8, 2019, the Defendant underwent his fifth eye surgery, as a planned procedure to address his retinal detachment with proliferative vitreoretinopathy in the right eye.

Shortly thereafter, however, he suffered complications from that surgery, which ultimately necessitated a subsequent emergency surgery on October 22, 2019, to try and resolve the complications. As additional, independent verification of the nature of the Defendant's condition and his need for continuing post-operative care, a letter from the Defendant's surgeon, Dr. Rajiv Anand, is attached as Exhibit 2, wherein Dr. Anand discusses the Defendant's need for post-

Defendant's Opposed Motion for Reconsideration of Order of Detention
and Findings Made in Support Thereof
Page 15 of 18

operative care. Following that surgery, the Defendant was supposed to be under the continuing post-operative supervision of his surgeon, Dr. Rajiv Anand, at the Texas Retina Institute. Specifically, Dr. Anand instructed that the Defendant needs to "follow with [him] frequently to make sure he is stable." Exhibit 2, at 1. Another critical component of said post-operative care requires the Defendant to administer prescription eyedrops to his right eye four times daily.

From the time of his arrest on the morning of November 6, 2019, until at least the evening of November 9, 2019, however, he did not have access to his medication and was not able to administer his medication, as prescribed. Moreover, he has obviously not been able to present for post-operative care at his surgeon's office and will not be able to do so as called for by his surgeon should he remain detained pending trial. Specifically, he has missed at least one post-operative care appointment with Dr. Anand to date. The Defendant will continue to be unable to attend these critical post-operative care visits for as long as he remains in custody. Given his current condition and circumstances, there is a risk of permanent, irreversible injury to his right eye. If not afforded the opportunity to receive this critical post-operative care, there is a risk that this condition could result in the Defendant permanently losing vision in his right eye while awaiting trial.

## VI.
## Conclusion

For the reasons discussed above, the Defendant respectfully requests that the Court reconsider its finding that the Defendant violated his conditions of release, and issue a revised order finding no violation and authorizing his release pending trial, subject to any conditions which the Court finds to be appropriate. Such an order would best comply with the objectives of 18 U.S.C. 3142 to impose the least restrictive combination of conditions which will reasonably assure the Defendant's appearance and the safety of any other person and the community.

Defendant's Opposed Motion for Reconsideration of Order of Detention
and Findings Made in Support Thereof
Page 16 of 18

WHEREFORE, PREMISES CONSIDERED, the Defendant prays that this Motion be in all things granted and that the Court enter an order finding that the Defendant has not violated his conditions of release and authorizing the immediate release of the Defendant pending trial, subject to any appropriate conditions of release, or in the alternative, that the Court enter an order finding that, to the extent that the Defendant did violate the terms of his release, sufficient conditions nonetheless exist which will reasonably assure his appearance and the safety of any other person and the community.

Respectfully submitted,

 */s/ Daniel K. Hagood*
**DANIEL K. HAGOOD, P.C.**
Texas Bar No. 08698300
2515 McKinney Avenue
Chateau Plaza, Suite 940
Dallas, Texas 75201
Telephone:  214-720-4040
Email:  dhagood@sorrelshagood.com

**BRIAN D. POE**
Texas Bar No. 24056908
909 Throckmorton Street
Fort Worth, TX 76102
Telephone:  817-870-2022
Email:  bpoe@bpoelaw.com

**ALEXANDRA HUNT**
Texas Bar No. 24095711
2515 McKinney Avenue
Chateau Plaza, Suite 940
Dallas, Texas 75201
Telephone:  214-720-4040
Email:  ahunt@sorrelshagood.com

**COUNSEL FOR DEFENDANT COMU**

Defendant's Opposed Motion for Reconsideration of Order of Detention
and Findings Made in Support Thereof
Page 17 of 18

**CERTIFICATE OF CONFERENCE**

I hereby certify that I have conferred with USDOJ Trial Attorney Christopher Fenton regarding the above motion and that he is opposed to the granting of same.

    /s/ Daniel K. Hagood
DANIEL K. HAGOOD, P.C.

**CERTIFICATE OF SERVICE**

I hereby certify that on the 22nd day of November, 2019, a true and correct copy of the foregoing document was filed with the Clerk of the Court for the United States District Court, Northern District of Texas using the electronic case filing system, which provides for service upon all counsel of record.

    /s/ Daniel K. Hagood
DANIEL K. HAGOOD, P.C.

Defendant's Opposed Motion for Reconsideration of Order of Detention
and Findings Made in Support Thereof
Page 18 of 18