IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

UNITED STATES OF AMERICA

v.                                                    No. 3:19-CR-112-K

CENGIZ JAN COMU

**DEFENDANT'S MOTION FOR REVIEW AND REVOCATION OF MAGISTRATE JUDGE'S ORDER OF DETENTION AND APPEAL OF MAGISTRATE JUDGE'S ORDER DENYING DEFENDANT'S MOTION FOR RECONSIDERATION**

TO THE HONORABLE JUDGE OF SAID COURT:

For the reasons that follow, the Defendant, Cengiz Jan Comu, and respectfully submits this Motion for Review and Revocation of Magistrate Judge's Order of Detention, pursuant to 18 U.S.C. § 3145(b), and Appeal of U.S. Magistrate Judge Rebecca Rutherford's Order Denying the Defendant's Motion for Reconsideration, pursuant to 18 U.S.C. § 3145(c):

## I.
## Introduction

The Defendant respectfully seeks review and revocation of Magistrate Judge Rutherford's Order of Detention (originally entered as Dkt. No. 136, then subsequently affirmed after reconsideration as Dkt. No. 198) based upon both a critical change in material circumstances which has occurred since the entry of Magistrate Judge Rutherford's Order, as well as the applicable legal principles which support the Defendant's position that his conduct did not, in fact, rise to the level of a violation of his conditions. Furthermore, even to the extent that the Court may reject the Defendant's position that no violation occurred, the Defendant respectfully submits that the evidence nonetheless shows that there are available conditions of release which would be sufficient to ensure both his appearance and the safety of the public.

Defendant's Motion for Review and Revocation of Magistrate Judge's Order of Detention and Appeal of Magistrate Judge's Order Denying Defendant's Motion for Reconsideration
Page 1 of 26

As discussed below, an ever-increasing amount of time has passed since the Defendant's arrest, during which he has been unable to obtain critical post-operative medical care. Despite the Government's assurances that the Dallas County Jail would be well-suited and capable of providing the necessary care through the Parkland Health and Hospital System (hereafter "Parkland"), the Defendant has not received any access to treatment or evaluation at Parkland, even over two weeks after being transferred to the Dallas County Jail for that express purpose. In addition, the Defendant reports that he has put in requests to obtain medical treatment from his treating physician and surgeon, Dr. Rajiv Anand, on at least two occasions (December 27, 2019 and December 30, 2019), to no avail. In fact, the Defendant has just recently been informed that he will not, at any point while in the Dallas County Jail, be permitted to receive care from Dr. Anand, as the Government had represented was the case. Given that the existence of this treatment option appears to have played a significant role in Magistrate Judge Rutherford's decision, the fact that the Dallas County Jail has since indicated that no such visits will be permitted is a significant change in material circumstances which warrants consideration.

Further, with respect to the legal principles which govern the allegedly violative conduct, the case law discussed herein demonstrates that the Defendant's conduct did not, in fact, constitute "promoting or advising on" the purchase or sale of securities. As an initial matter, there was no purchase or sale of securities at issue here which the Defendant could have been acting in connection with. Moreover, even assuming that there had been a purchase or sale of securities at issue here, a review of the actual conduct identified as violative by Magistrate Judge Rutherford shows that said conduct did not constitute "advising" even in the ordinary sense of the word. Finally, to the extent that the Court nonetheless finds that the Defendant's conduct did constitute a violation, there is evidence that the Defendant would abide by any conditions imposed, and that

there are available conditions which could amply satisfy the goals of ensuring the Defendant's appearance, as well as the safety of the public.

For these reasons, as set forth in detail below, the Defendant respectfully requests that Magistrate Judge Rutherford's Order of Detention be revoked and that the Court issue an Order reinstating the Defendant's pretrial release, subject to home incarceration and/or such conditions of release as the Court deems appropriate.

## II.
## Relevant Background

On November 1, 2019, the Government filed its Sealed Ex Parte Motion to Revoke the Pretrial Release of Defendant Cengiz Jan Comu (hereafter "Motion to Revoke") (Dkt. No. 110). On November 7, 2019, the Defendant was arrested and the Motion to Revoke was disclosed to counsel for the Defendant. On November 8, 2019, the Defendant filed a written response to the Motion to Revoke and a hearing was held regarding the same. At that hearing, the Government presented evidence that the Defendant had communicated with an individual by the name of Nick Mysore (hereafter "Mysore") regarding Mysore's potential interest in trying to acquire EarthWater and attempt to get it back into operation. In connection with these discussions, an unexecuted, draft version of a document titled "Confidential Letter of Intent & Term Sheet" (hereafter "Letter of Intent") was exchanged between the Defendant and Mysore.

At the conclusion of the hearing, Magistrate Judge Rutherford found that "the documents indicate that Mr. Comu was certainly involved in advising on the purchase or sale of securities," and ordered the Defendant detained pending trial. Transcript, at 80, lines 12-14 (Dkt. No. 140). On November 13, 2019, a written order memorializing that verbal order was entered and distributed to the parties. *See* Order (Dkt. No. 136). In that Order, Magistrate Judge Rutherford again focused on the Defendant's conduct of "advising," stating that the "terms of the LOIs

establish by clear and convincing evidence that Defendant was advising on the purchase and sale of EarthWater securities." *Id.*, at 5. Further, Magistrate Judge Rutherford found that the Defendant would be unlikely to abide by any conditions, based upon the fact that he "was not forthcoming with information to the government about the proposed transactions," and that his "conduct appears to be part of a pattern of disregard for court orders and the judicial process." *Id.* at 6.

Shortly thereafter, on November 22, 2019, the Defendant filed his Opposed Motion for Reconsideration of Order of Detention and Findings Made in Support Thereof (hereafter "Motion for Reconsideration") (Dkt. No. 162), to which the Government filed a Response on December 6, 2019 (Dkt. No. 169). On December 13, 2019, the Defendant filed a Motion for Leave to File a Reply to the Government's Response, so as to be able to respond to the numerous inaccurate and/or misleading statements contained therein. Although the Government filed a response in opposition to the Defendant's request for leave to file, the Court granted the Defendant's request and allowed the filing, which was entered on December 16, 2019 (Dkt. No. 183).

A hearing was held the following day, during which Magistrate Judge Rutherford stated that she "ha[d] reconsidered [her] decision." Exhibit 1 (Transcript), at 18, line 23. Namely, Magistrate Judge Rutherford explained that, although she did "not find [the] arguments that he did not violate his conditions of release availing, ... the circumstance with his eye [was] concerning to [her]." *Id.* at 18–19, lines 23–25, 1. Magistrate Judge Rutherford further noted that she has "a lot of experience with jail medical facilities, and [she does] have a concern that, especially when it comes to the eye, things can happen very quickly and the damage can be irreparable." *Id.* at 19, lines 1–4. Accordingly, Magistrate Judge Rutherford stated that she was "considering allowing him to be released to home incarceration and conditions of release," but would "need additional evidence before [she] [could] make a final decision," namely: "the address [where the Defendant

would be released to], ... an inspection of the property, ... [and] an executed lease or purchase agreement for the place." *Id.* at 19, 37, 38, lines 6–7, 24–25, 1–2. As directed by the Court, the Defendant (through undersigned counsel) promptly submitted the requested documentation to the U.S.P.O. Lisa Evans and arranged for her to conduct a visit and inspection of the residence the next day.

Shortly after the conclusion of that hearing, counsel for the Government informed the undersigned that the Defendant was being transferred to a different facility which would be able to provide a higher level of treatment. Later that same day, the Government filed a "Notice to the Court" (Dkt. No. 186) in which the Government set forth various representations regarding the availability of medical treatment in custody. The Defendant submitted a response thereto, in order to provide the Court with relevant information not included in the Government's Notice. Over the following several days, the Government filed two additional "Notices" (Dkt. Nos. 190, 193) to which the Defendant again filed responses (Dkt. Nos. 192, 194), in an effort to supply missing information and correct what, at least in the view of the Defendant's counsel, were some inaccurate and/or misleading representations by the Government.

The main issue addressed in these notices and responses was the purported availability of medical care from Dr. Anand and/or Parkland to the Defendant while in custody. In fact, it appears that this was an issue of great concern to Magistrate Judge Rutherford, and one which may have ultimately played a significant role in her decision. Specifically, in the order denying the Defendant's Motion for Reconsideration, Magistrate Judge Rutherford stated the following:

> While the motion was under advisement, Defendant was transferred to the Dallas County Jail, **where he will have access to post-operative retinal care and treatment from an ophthalmology specialist at Parkland Health and Hospital System**. Additionally, Defendant's treating physician, **Dr. Rajiv Anand, confirmed that he could provide post-operative care to Defendant while**

**Defendant is in custody**. In view of all the evidence available, the Court finds that Defendant's current medical condition does not weigh in favor of release.

Order, at 4 (Dkt. No. 198) (emphasis added). Accordingly, it appears quite clear from Magistrate Judge Rutherford's order that the purported availability of medical treatment from both Parkland and/or Dr. Anand was a critical factor upon which she based her decision.

## III.
### Defendant's Inability to Obtain Adequate Medical Care Constitutes a Material Change of Circumstances Which Argues in Favor of Release

Unfortunately, despite the numerous representations made by the Government in its various filings, it has since become quite clear that medical treatment from either Dr. Anand or Parkland is not, in fact, reasonably available to the Defendant as the Government suggests. As set forth in detail below, the fact is that despite the Defendant's transfer[1] over two weeks ago, the Defendant has yet to be examined or treated by any member of the Parkland staff, much less be transported to Dr. Anand's office for any examination or treatment there. In fact, after making two specific requests for an appointment to be made on his behalf with his treating physician and surgeon, Dr. Anand, the Defendant was informed on or about January 1, 2020 that he will not be transported to Dr. Anand's office at any time while in custody at the Dallas County Jail. This fact is one of vital importance where the issue of whether adequate medical treatment is available to the Defendant while in custody has been such a clear focus of Magistrate Judge Rutherford's inquiry and ultimate decision, thereby warranting significant consideration in this context.

---

[1] A transfer which was purportedly made for the "express purpose of getting him medical treatment for his eye condition;" treatment that he was supposed to have received "immediately upon being transferred." Government's Notice to the Court, at 1–2. (Dkt. No. 186).

## A. Defendant's Medical Condition

The Defendant suffers from continued complications stemming from a severe impact injury to his right eye which occurred in March 2018, resulting in retinal detachment with proliferative vitreoretinopathy in his right eye, requiring him to undergo a total of six separate eye surgeries to date since that accident. On October 8, 2019, the Defendant underwent his fifth eye surgery, as a planned procedure to address that condition. Shortly thereafter, however, he suffered complications from that surgery, which ultimately necessitated a subsequent emergency surgery on October 22, 2019, to try and resolve the complications. Following that surgery, the Defendant was supposed to be under the continuing post-operative care of his surgeon, Dr. Rajiv Anand, a physician at the Texas Retina Institute, which "focuses specifically on the diagnosis and medical and surgical management of diseases of the retina and vitreous." Exhibit 2, at 1. Specifically, Dr. Anand has instructed that the Defendant needs to "follow with [him] frequently to make sure he is stable." Exhibit 3, at 1. Another critical component of said post-operative care requires the Defendant to administer prescription eyedrops to his right eye four times daily.

The importance of following Dr. Anand's instructions regarding the necessary post-operative care is particularly great considering the severity of the potential complications that can arise from the surgeries that the Defendant has undergone. Namely, these surgeries can result in any of the "following complications: further retinal detachment, and glaucoma." Exhibit 2, at 1. Perhaps even more concerning than the severity of these complications is the severity of the ultimate impact they can have on a patient, namely that "[f]ailure to properly treat these complications could result in **loss of vision**." *Id.* (emphasis added). Furthermore, if "there are complications, eg, glaucoma or recurrent retinal detachment, eye surgery may be required at short notice." *Id.* at 2. Of course, *that has already been the case for the Defendant*, in that the October

22, 2019 surgery was an emergency procedure necessitated by complications which arose from the October 8, 2019 procedure.

Given this medical history, combined with the magnitude of the very real possibility that this man could permanently lose vision in his right eye if he encounters complications which are not promptly (and properly) treated, the imperative nature of allowing him access to adequate medical care cannot be understated.[2] Despite this dire need for medical treatment, however, the Defendant has not received any such postoperative care since his arrest.

### B. Inability to Obtain Critical Medical Treatment in Custody

As discussed at the outset of this motion, there has been much focus placed on the issue of what, if any, medical care is available to the Defendant while in custody. Based on the representations made by the Government, the belief of the parties (and presumably of the Court) prior to January 2, 2020 was that the Defendant would have the ability and opportunity to be transported to Dr. Anand's office for medical care, even if he remained in custody. For instance, in its Supplemental Notice to the Court, the Government stated that "Dr. Anand is willing to continue seeing Defendant while in custody, [and that] a call just needs to be placed to Dr. Anand's office to schedule an appointment." Government's Supplemental Notice to the Court, at 1 (Dkt. No. 193). Likewise, in the order denying the Defendant's Motion for Reconsideration, Magistrate Judge Rutherford observed that "Dr. Rajiv Anand confirmed that he could provide post-operative care to Defendant while Defendant is in custody." Order, at 4. (Dkt. No. 198). As such, although the precise details such as how quickly and/or how often the Defendant would be able to obtain

---

[2] The Defendant reports that his vision has declined significantly (and continues to do so) since the time of his arrest, however without an evaluation or treatment by any ophthalmologist since he was taken into custody, the undersigned has no means of confirming that information or gauging the severity of the apparent complication.

access to this care, etc. had not been solidified, it is clear that the parties and Court were operating on the belief that the Defendant would have access to Dr. Anand's treatment while in custody.

Recent developments have made clear, however, that regardless of Dr. Anand's willingness to treat the Defendant while he is in custody, the Dallas County Jail has no intention, whatsoever, of allowing any such treatment to occur. Instead, after making at least two formal requests to see Dr. Anand through the proper procedural channels at the Dallas County Jail (on or about December 27, 2019 and December 30, 2019), the Defendant was informed on or about January 1, 2020 that he will not be permitted to see Dr. Anand at any point while being housed in the Dallas County Jail. Instead, his request is being processed for purposes of securing a visit to Parkland, however the Defendant was not given any estimated date or time for said visit beyond a general representation that such visit should occur sometime within the next several weeks.

This is a stark contrast to the Government's claims that "the defendant should receive medical treatment immediately upon being transferred." Government's Notice to the Court, at 1–2 (Dkt. No. 186). ***At this point, it has been over two weeks since that transfer occurred, yet the Defendant has still not received any evaluation or treatment from Parkland***. Moreover, as stated above, the Defendant is currently being told that it could be several additional weeks before he could be taken to Parkland for medical evaluation and treatment. As such, as of January 6, 2020, the Defendant will have gone three months without a single post-operative evaluation by a qualified physician. In other words, the Government's repeated and emphatic assertions that the Dallas County Jail can provide more than adequate treatment to the Defendant (*i.e.* "...the defendant should receive medical treatment immediately upon being transferred ... once the defendant is transferred, he will receive the care he needs...") have been shown to be entirely false.

Government's Notice to the Court, at 1–2 (Dkt. No. 186). The Defendant has received no such treatment, whether from Parkland or elsewhere since his arrest nearly three months ago.

In fact, from the time of his arrest on the morning of November 6, 2019, until at least the evening of November 9, 2019, he did not even have access to his medication, which was prescribed to be taken four times daily. Similarly, following his transfer to the Dallas County Jail, the Defendant was again deprived of access to his prescription medication for at least two days. Clearly, where the Defendant's surgeon has unambiguously stated that the **Defendant's** "**eye will need frequent follow-up examinations by a physician equal to or superior to [him] in training, experience, and skill**," and that "**an ophthalmology examination should be done at regular intervals with a ophthalmology specialist**," yet the Defendant has not had even one such examination since his arrest nearly **three months ago**, it cannot be said that he is receiving even minimally adequate medical care while in custody. Exhibit 2, at 2.

Additionally, with respect to the Government's observation that "Dr. Anand is willing to continue seeing Defendant while in custody," and that "Defendant fails to explain why this does not resolve the issue," that explanation is quite simple indeed. Government's Supplemental Response, at 1. (Dkt. No. 193). *First, Dr. Anand's willingness to treat the Defendant is entirely irrelevant so long as the Dallas County Jail refuses to allow it*. Second, even assuming that the Dallas County Jail would allow such treatment, that does not somehow resolve the issue of the Defendant's inability to obtain treatment (or possibly surgery) on short notice in the event of a complication while in custody. As set forth in Dr. Anand's affidavit, the Defendant's condition is such that complications could arise suddenly and without warning, requiring eye surgery at short notice. Exhibit 2, at 2. Thus, even with Dr. Anand willing to treat the Defendant, it is entirely unreasonable to believe that the Defendant would be able to obtain prompt or even relatively quick

access to such treatment should complications arise while he is in custody. As such, the mere fact of his willingness to treat the Defendant while in custody does not resolve the significant need for his release.[3]

Allowing the Defendant to be released subject to home incarceration and conditions of release, such that he would have access to much-needed post-operative care and treatment by Dr. Anand*, including the critical ability to obtain timely and adequate treatment in the event that he should encounter a time-sensitive complication*, would be appropriate in this case, given the unique and significant nature of his current medical condition. Accordingly, the Defendant respectfully submits that releasing him subject to home incarceration and other conditions as ordered by the Court, for the express and limited purpose of allowing him to receive treatment from his existing ophthalmic surgeon (a specialist in vitreoretinal surgery and medical retina) would be in the best interests of justice, while still providing reasonable assurance of the Defendant's appearance and protection of the community. *See United States v. Fortna*, 769 F.3d 243, 250 (5th Cir. 1985) (Courts are to "impose conditions that will "reasonably assure—not guarantee—the appearance of the person as required and the safety of any other person and the community.")

## IV.
## Defendant's Conduct Did Not Constitute a Violation of His Conditions

In addition to the material change of circumstances discussed above, the Defendant respectfully submits that the following legal analysis provides further support for the requested revocation of Magistrate Judge Rutherford's Order of Detention, in that it supports the conclusion

---

[3] Moreover, despite the Government's repeated representations regarding the qualified ophthalmologists and retinal specialists on staff (not to mention the fact that the Defendant was transferred to Dallas County "for the express purpose of getting him medical care for his eye condition from Parkland Health and Hospital System,") **over two weeks later, the Defendant has still yet to be treated by any Parkland physician, much less an ophthalmologist or retinal specialist.** Supplemental Response, at 1. (Dkt. No. 193). Clearly, the Court's concerns about the adequacy of medical treatment while in custody are well-founded and continue to be directly applicable here.

that his conduct did not constitute a violation of his conditions. Namely, in order to determine the critical issue in this case (whether the Defendant violated his conditions of release by "advising on the purchase or sale of securities"), it is crucial to first define and understand that language with the greatest possible precision. While the Defendant recognizes that a "fully-consummated sale of securities" was not required to violate his conditions, the Defendant respectfully submits that there must at least be a showing of a potential sale of securities, *i.e.* a contract for the sale of securities, even if not fully-consummated. In other words, while the violative nature of conduct consisting of "advising" with respect to a contemplated transaction is not dependent on the transaction's status as having been "fully-consummated," it *is dependent* on the transaction having contemplated a purchase or sale of securities. As such, the Defendant's conduct in connection with the Letter of Intent, even if found to constitute "advising," was not "advising *on the purchase or sale of securities*," and therefore did not amount to a violation of his conditions.

### A. Relevant Legal Definitions

To that end, a review of the prolific securities case law dealing with Section 10(b) of the 1934 Act and Rule 10b-5 proves instructive, given that these cases routinely analyze the threshold determination of whether certain conduct was committed "in connection with the purchase or sale of any security." 15 U.S.C. § 78j(b). In this context, the term "purchase" is defined as "any contract to buy, purchase, or otherwise acquire," and the term "sale" is defined as "any contract to sell or otherwise dispose of." 15 U.S.C. § 78c(a)(13)-(14) (1981). Additionally, the definition of the term "security" includes, in relevant part, any "investment contract." 15 U.S.C. § 78c(a)(10) (1981). While these terms are to be "broadly construed" and "not limited to their common-law meaning," the court does not "possess license to strip the statutory words 'purchases' or 'sale' of their core meaning in an attempt to create a purchase or sale by judicial fiat." *Southwest Realty, Ltd. v.*

*Daseke*, No. CA3-89-3055-D, 1990 WL 85921 at * 6 (N.D. Tex. May 9, 1990) (internal quotation marks omitted). In order to determine whether the Defendant's conduct constituted "advising *on the purchase or sale of securities*," we must analyze said conduct within this framework.

To do so, we must first address the critical threshold inquiry – that is, whether the Letter of Intent constituted an investment contract, such that it would fall within the definition of a security. This inquiry is of manifest importance, given that the prohibited actions (promoting or advising) are prohibited only to the extent that they do so "on the purchase or sale of securities." Without the existence of a security, then, there can be no violation. In *Southwest Realty*, an opinion issued by the U.S. District Court of the Northern District of Texas, a very similar set of facts was analyzed in the context of securities law, specifically considering whether the conduct at issue therein had been committed in connection with the purchase or sale of any security. *See id.* at *6. In that case, the court observed that the "ultimately dispositive question [t]here [wa]s whether the March 7, 1988 letter of intent constituted a contract for the sale of securities." *Id.*

In analyzing this issue, the court observed that numerous other courts considering this question "have concluded that a letter of intent setting forth the parties' intended agreement does not constitute a contract for the sale of securities for purposes of federal securities laws." *See, e.g., Portnoy v. Revlon, Inc.,* 650 F.2d 895, 899 (7th Cir. 1981) (letter of intent fell short of establishing binding commitment; securities claims dismissed); *Southeastern Waste Treatment, Inc. v. Chem–Nuclear Systems, Inc.,* 506 F.Supp. 944, 948–49 (N.D. Ga. 1980) (letter of intent did not create contract between parties; securities claims dismissed); *Dunhill Sec. Corp. v. Microthermal Applications, Inc.,* 308 F.Supp. 195, 197–98 (S.D.N.Y. 1969) (letter of intent regarding proposed public offering did not bind parties); *cf. Southmark Corp. v. Life Inv., Inc.,* 851 F.2d 763, 766–68 & n. 7 (5th Cir. 1988) ("Memorandum of Understanding" and "notification letter" between buyer

and seller of stock not sufficient to create a contract); *Northland Capital Corp. v. Silver*, 735 F.2d 1421, 1427–29 (D.C. Cir. 1984) (letter agreement not sufficient to establish existence of contract absent formal closing of deal).

In addition to the guidance offered by these decisions, the court made note of the fact that the "letter of intent was expressly made subject to the final legal documentation for the rights offering, ... listed numerous conditions necessary to a final agreement, and [wa]s couched in terms of what the parties 'would' agree to do." *Southwest Realty*, No. CA3-89-3055-D at *6. Further, the court pointed out that because "the rights offering never came to fruition, many of the conditions never occurred." *Id.* "At most, the letter of intent reflected the parties' agreement to use their best efforts to complete the deal." *Id.* For these reasons, the court found that the "letter of intent *did not constitute a contract for the sale of securities*," and thus that no claims "in connection with the purchase or sale of a security" could arise therefrom. *Id.* (emphasis added).

The Letter of Intent at issue here possesses all the same characteristics which were found to be significant by the court in *Southwest Realty*, namely the qualified, conditional nature of its provisions and the need for additional future transactions before the ultimately contemplated sale of securities could occur. Just as in that case, the Letter of Intent at issue here "listed numerous conditions necessary to a final agreement, and [wa]s couched in terms of what the parties 'would' agree to do." *Id.* As a result, despite contemplating that a proposed offering of securities might potentially occur if and when certain subsequent, additional agreements were entered into, the Letter of Intent itself "did not bind either party to the proposed [] offering, [and thus] did not constitute a contract for the sale of securities." *Id.*

In fact, the circumstances at hand arguably present an even stronger basis upon which to conclude that no securities were involved, to the extent that not even the Letter of Intent (much

less the further agreements contemplated therein) was ever executed in this case. In another opinion addressing the issue of whether certain conduct was committed "in connection with the purchase or sale of any security," the D.C. Circuit Court of Appeals analyzed a factually similar situation. Specifically, the parties in that case had "prepared a memorandum describing the proposed investment," "sent the memorandum to a variety of [potentially interested parties]," and drafted an "agreement letter" which set forth the drafting party's understanding of the terms of the contemplated transaction, among other actions "in the course of *attempting* to negotiate and close a deal." *Northland Capital Corp.*, 735 F.2d at 1423–24, 31 (emphasis in original). Despite the fact that these negotiations were aiming to complete the first piece of multi-phase transaction that ultimately contemplated a future sale of securities, the court found that said facts "simply do not constitute the purchase or sale of securities," where the documents "plainly contemplated both a closing and a transaction with a group of investors," – two subsequent, future requirements which would have to occur in order to give rise to the ultimately contemplated sale of securities. As such, the court affirmed the lower court's finding that the plaintiff "was not a purchaser of securities, inasmuch as [the parties] never came to a meeting of the minds with respect to the purchase of the securities in question," and therefore that the plaintiff could not satisfy the "requirement that the fraud be in connection with the purchase or sale of any securities." *Northland Capital Corp.*, 735 F.2d at 1422.

Furthermore, even if the Mysore Letter of Intent had been consummated, it still would not have resulted in a sale of securities, and thus cannot be said to constitute a contract for the sale of

securities.[4] *See Southwest Realty, Ltd.*, at *6 (Where agreement "contemplated the existence of future transactions" before the proposed offering could occur, it "did not bind either party to the proposed rights offering," and "did not constitute a contract for the sale of securities.") Accordingly, the status of the transaction as being "fully-consummated" or otherwise has no effect on the critical question – whether the contemplated (and potentially unconsummated) transaction was one for the purchase or sale of securities.

For the same reasons, it is evident that the Shields Letter of Intent likewise did not constitute a contract for the sale of securities. Thus, the fact that it was executed by the parties does not somehow transform it from a mere Letter of Intent, outlining non-binding terms for a potential transaction expressly conditioned upon the execution of subsequent binding agreements, into an actual contract for the sale of securities, the execution of which would actually result in a binding sale of securities, without the need for any subsequent or future agreements or occurrences. Therefore, much like the Mysore Letter of Intent, the Shields Letter of Intent is similarly incapable of giving rise to potential violations of the Defendant's conditions of release, even to the extent that the Defendant's actions in connection therewith could be construed as "advising."

Just as in the above-cited cases, the Defendant and Mysore never came to a meeting of the minds, never entered into a binding agreement, and most critically of all, never conducted a sale of securities. The interaction between them consisted of preliminary negotiations, at best, but even if the Letter of Intent had been entered into, its terms were such that it would still not have constituted a contract for the sale of securities even if executed. In short, the act of "advising" with

---

[4] Any potential sale of securities, as described by the terms of the Letter of Intent, could only have occurred subject to and as a result of the "execution of definitive agreements by the Parties." Letter of Intent, at 1. As such, it would be those subsequent, future "definitive agreements" which would constitute the contract for the sale of securities, if any were to ultimately arise from the proposed transaction.

respect to a transaction which does not occur in connection with a sale of securities (whether such sale is fully-consummated or merely would be the result of executing the contract for the sale of securities which is the subject of the transaction) does amount to a violation of the Defendant's conditions of release.

### B.  No Evidence of "Advising"

Additionally, the evidence does not show that the Defendant advised Mysore with respect to the potential sale or purchase of securities. The Defendant did not set out a plan for how to go about attempting to conduct the capital raises mentioned in the Letter of Intent. Nor did he counsel Mysore as to the relative benefits or detriments which the proposed draft Letter of Intent might ultimately have on Mysore. Rather, Mysore appears to have been more than capable of conducting the negotiations without any advice or guidance from the Defendant. As the Court aptly pointed out in its Order, "Mysore countered Defendant's proposed LOI with his own proposed Non-Binding Letter of Intent that contemplated a vastly different arrangement." Order, at 4, n.1 (Dkt. No. 136). As such, the evidence demonstrates that the Defendant was not acting as an advisor, but merely as an arms-length, effectively adverse party in a preliminary stage of negotiations. Particularly as here, where the parties' interests clearly differed in substantial respects, it would be highly unusual for the Defendant to have been "advising" Mysore in any sense of the word, with respect to the negotiations between them.

Further, with respect to the Court's finding that the "terms of these LOIs establish by clear and convincing evidence that Defendant was advising on the purchase and sale of EarthWater securities," the Defendant would respectfully note that the terms cited by the Court in connection with said finding were not drafted by the Defendant, but rather by members of the Shields Law Group, with revisions and input from Larry Friedman (EarthWater's then corporate counsel).

Order, at 5 (Dkt. No. 136). In fact, the Defendant did not so much as propose these terms in the Shields transaction, which was negotiated entirely by Mr. Friedman on EarthWater's behalf. Thus, with respect to the terms in question, the Defendant did not play any role as to the Shields transaction, and with respect to the Mysore negotiations, his role was limited to passing these terms on to Mysore as a potential starting point for their negotiations. In light of that fact, even to the extent that these terms constituted "advice" from any party, they would have been the advice of the Shields Law Group, not of the Defendant.

For these reasons, the Defendant respectfully submits that his conduct did not amount to a violation of his conditions.

### V.
### Available Conditions of Release Can Ensure Public Safety

To the extent, however, that the Court upholds Magistrate Judge Rutherford's finding that the Defendant's conduct constituted a violation of his conditions of release, the Defendant respectfully submits that there are nonetheless conditions sufficient to ensure both the Defendant's appearance and the safety of the public. This holds particularly true in light of the fact that the Court's directive is to "impose conditions that will reasonably assure—not guarantee—the appearance of the person as required and the safety of any other person and the community." *See United States v. Fortna*, 769 F.3d 243, 250 (5th Cir. 1985). For the reasons set forth below, the Defendant respectfully submits that the conditions proposed herein are sufficient to reasonably assure the Defendant's appearance and the safety of the public.

#### A. Despite the Government's Unsupported Arguments to the Contrary, the Defendant Has Shown That He is Likely to Abide by Any Conditions Imposed

As a major facet of its argument that the Defendant is unlikely to abide by any conditions of release, the Government has repeatedly pointed to a nearly thirty-year-old SEC Order which

prohibits the Defendant from selling unregistered securities. Further, the Government has repeatedly argued that this Order, when considered in connection with the Defendant's bankruptcy proceedings, establishes a pattern of disregard for court orders and judicial process. What the Government has not argued, however, is how or when the Defendant has allegedly *violated* this 1989 Order. In fact, there has not been any evidence presented which would establish that the Defendant has sold unregistered securities in violation of that Order. As such, it is improper for the Government to repeatedly assert that the mere existence of this Order somehow establishes a pattern of disregard for court authority. Without a violation of the Order, there is no showing of disregard for its authority. And to the extent that the Government may attempt to claim that the allegations of the indictment demonstrate disregard for the Order, any such argument would be unavailing, given that unproven allegations in an indictment are not evidence. Based on the fact that there is no evidence before the Court that the Defendant has sold unregistered securities in violation of the SEC Order, its existence should not be relied on as a basis to assert that the Defendant has displayed a pattern of disregard for court authority.

To the same end, the much more recent – and much more relevant – pattern of conduct, *i.e.* his conduct while on pretrial release in this case offers many examples of the Defendant's compliance with the Court's Orders. Of course, the conduct at issue here (as the rulings currently stand) has been found to constitute a violation of the Defendant's conditions. And while that ruling may well be upheld, the Defendant submits that the crucial aspect of that conduct (with respect to the determination of whether the Defendant is likely to abide by conditions) is whether he believed his actions to be in compliance with his conditions. Regardless of whether the conduct ultimately proved to be a violation, it would be illogical to conclude that such conduct demonstrated a disregard for the Court's authority if, albeit incorrectly, the Defendant engaged in the conduct

believing it to be compliant with the terms of his release. As argued at the hearing and in the Defendant's Response to the Government's Motion, the Defendant did not view the Letter of Intent and related discussions to be a violation of his conditions. As such, his misunderstanding and/or incorrect interpretation of his special conditions of release should not be used as a basis on which to conclude that he has shown a disregard for court authority or that he is unlikely to abide by any conditions.

Likewise, the Defendant's belief that he was not violating his conditions of release is a fact of vital importance when considering the Court's observation that he "should have disclosed his activities to his supervising officer because they affected a condition of his release." Order, at 6 (Dkt. No. 13). Just as with respect to the Defendant's alleged pattern of disregard for court authority, the fact that he did not affirmatively disclose this conduct to his supervising officer establishes a wrongful intent only to the extent that he believed it to be affecting his conditions of release, and therefore subject to disclosure. With regard to the terms of the proposed transaction, the Defendant likewise saw nothing improper about leaving disclosure of the transaction up to the discretion of NEWCO, given his belief that his role in negotiating a potential Letter of Intent did not constitute a violation.

Notably, this belief was reinforced by the fact that the Government did not raise any issue of a potential violation of his conditions of release in response to the Shields Letter of Intent, even after being advised of that document and engaging in discussion with the Shields Legal Team specifically pertaining to that proposed transaction. The Defendant knew that the Government had knowledge of the Shields transaction in June 2019, and he further knew that they took no action in response. The logical inference from those facts is that there simply was no "action" for the Government take, as the conduct did not constitute a violation. Considering these actions in

context, it becomes evident that, to the extent the Defendant was not forthcoming regarding the transaction, such conduct was not committed with a wrongful intent, but rather as the result of his inaccurate belief that his conduct was not in violation of his conditions.

Additionally, with respect to all of the other, much more straight-forward, conditions of his release, Defendant has shown his intent and desire to abide by the Court's Order through his constant and careful compliance with said conditions. There have not been any issues or alleged violations of any of the more standard conditions, including his geographic restrictions, his curfew, or his attendance and participation in any meetings scheduled by his supervising officer, USPO Lisa Evans. And despite the Government's unsupported allegations, there has been no evidence presented that he has violated the other special condition prohibiting him from having contact with any co-defendants or potential witnesses in this matter. Importantly, there has been no showing that he has violated any condition other than the one at issue, which is undoubtedly the one condition that is most subject to interpretation. In sum, the Defendant's compliance with each of the "black and white" conditions provides support for the fact that he does not have a general disregard for the Court's authority and is not unlikely to abide by any conditions.

**B. Sufficient Conditions Exist**

Consistent with the foregoing discussion, the Defendant respectfully submits that there are conditions sufficient to reasonably assure his appearance and the safety of the public, as set forth below. Accordingly, the Defendant respectfully requests that Magistrate Judge Rutherford's Order of Detention be revoked and that the Court issue an order releasing the Defendant pending trial, subject to the following supplemental conditions (or such other conditions as the Court deems necessary and appropriate):

1. <u>Resignation</u> – The Defendant has resigned from his former roles as Chairman and CEO of EarthWater, Ltd., which became effective on November 21, 2019, immediately upon the execution of same. *See* Exhibit 4; and

2. <u>Home Incarceration</u> – The Defendant shall be subject to Home Incarceration, restricting him to the confines of his residence at all times except for employment; religious services; medical, substance abuse, or mental health treatment; attorney visits; court appearances; court-ordered obligations; or other activities approved in advance by the pretrial office or supervising officer.

In this case, allowing the Defendant to be released pending trial, subject to the above supplemental conditions, would best achieve the mandate of 18 U.S.C. § 3142 to ascertain and "impose the least restrictive combination of conditions that the court determines will reasonably assure [a defendant's] appearance as required and the safety of any other person and the community." *United States v. Barker*, 3:16-CR-516-D, 2017 WL 345643, at *13 (N.D. Tex. Jan. 24, 2017). After all, the standard is not that the conditions must *guarantee* the Defendant's appearance and safety of the public, but rather that the conditions must *reasonably assure* his appearance and the safety of the public. *See Fortna* 769 F.3d at 250.

Particularly under the unique circumstances of this case, the conditions contemplated above will be sufficient to reasonably assure these goals. By tendering his resignation from his former roles at EarthWater, the Defendant has fully surrendered any and all authority to affect any action relating in any way to EarthWater's affairs, thereby completely "divorcing" himself from EarthWater. These facts constitute significantly changed circumstances from the facts which were before the Magistrate Judge Rutherford at the November 8, 2019 hearing on the Government's Motion to Revoke. To the extent that Magistrate Judge Rutherford inquired of the Defendant during that hearing whether he was truly willing to resign at that point in time, the Defendant has since submitted a fully executed and immediately effective resignation as further support for his

representation to Magistrate Judge Rutherford at that hearing that he was, indeed, ready and willing to do so. *See* Exhibit 4.

Importantly, the Defendant's problematic conduct stemmed entirely from his desire to try and "revive" EarthWater. Despite the Government's unsupported allegations, there has been no evidence, whatsoever, of any potentially violative conduct outside the confines of these efforts with respect to EarthWater. Now that this motivation has been eliminated, any perceived risk in that regard which may have existed at the time of the November 8, 2019 hearing has been ameliorated and is thus no longer applicable.

In short, the Defendant submits that the very conditions posed by Magistrate Judge Rutherford during the November 8, 2019 hearing (*i.e.* that the Defendant resign from his roles and "completely divorce from EarthWater"), along with home incarceration, would be sufficient here to satisfy the requirements of Section 3142. Accordingly, pretrial release subject to appropriate conditions would be most consistent with the mandate of 18 U.S.C. § 3142(e) that only when "no combination of conditions can reasonably assure the appearance of the [defendant] and the safety of the community shall" the defendant be detained pending trial. 18 U.S.C. § 3142(e). As such, the Defendant respectfully requests that Magistrate Judge Rutherford's Order of Detention be revoked on the grounds that there are sufficient conditions of release available to accomplish these purposes, in accordance with the applicable law.

## VI.
## Conclusion

For the reasons discussed above, the Defendant respectfully requests that Magistrate Judge Rutherford's Order of Revocation be revoked and that this Court issue an order authorizing his release to home incarceration pending trial, subject to any and all conditions which the Court finds to be appropriate. Such an order would best comply with the objectives of 18 U.S.C. 3142 to

impose the least restrictive combination of conditions which will *reasonably assure* the Defendant's appearance and the safety of any other person and the community. Particularly in light of the Defendant's serious medical condition, which carries a real risk of permanent loss of vision in his right eye, allowing the Defendant to be released to home incarceration with conditions of release such that he could receive much-needed post-operative medical care and treatment, would be both consistent with the applicable law and clearly in the best interests of justice.

WHEREFORE, PREMISES CONSIDERED, the Defendant prays that the foregoing motion be in all things granted and that the Court enter an order finding that the Defendant has not violated his conditions of release and authorizing the immediate release of the Defendant pending trial, subject to home incarceration and any appropriate conditions of release, or in the alternative, that the Court enter an order finding that, to the extent that the Defendant did violate the terms of his release, sufficient conditions nonetheless exist which will reasonably assure his appearance and the safety of any other person and the community, and ordering the immediate release of the Defendant pending trial, subject to home incarceration and any such conditions.

Respectfully submitted,

*/s/ Daniel K. Hagood*

**DANIEL K. HAGOOD, P.C.**
Texas Bar No. 08698300
2515 McKinney Avenue
Chateau Plaza, Suite 940
Dallas, Texas 75201
Telephone:  214-720-4040
Email:  dhagood@sorrelshagood.com

**BRIAN D. POE**
Texas Bar No. 24056908
909 Throckmorton Street
Fort Worth, TX 76102
Telephone:  817-870-2022
Email:  bpoe@bpoelaw.com

**ALEXANDRA HUNT**
Texas Bar No. 24095711
2515 McKinney Avenue
Chateau Plaza, Suite 940
Dallas, Texas 75201
Telephone:  214-720-4040
Email:  ahunt@sorrelshagood.com

**COUNSEL FOR DEFENDANT COMU**

**<u>CERTIFICATE OF CONFERENCE</u>**

I hereby certify that I have conferred with USDOJ Trial Attorney Christopher Fenton regarding the above motion and that he is opposed to the granting of same.

 _/s/ Daniel K. Hagood_
 DANIEL K. HAGOOD, P.C.


**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the 3rd day of January, 2020, a true and correct copy of the foregoing document was filed with the Clerk of the Court for the United States District Court, Northern District of Texas using the electronic case filing system, which provides for service upon all counsel of record.

 _/s/ Daniel K. Hagood_
 DANIEL K. HAGOOD, P.C.