IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 3:19-CR-112-K |
| CENGIZ JAN COMU | |

**DEFENDANT'S EMERGENCY MOTION FOR TEMPORARY RELEASE TO HOME CONFINEMENT BASED UPON THE COVID-19 PANDEMIC**

COMES NOW, the Defendant, Cengiz Jan Comu, and respectfully submits this motion seeking temporary release to home confinement based upon the real and substantial heath risk and the inability to safely participate in the preparation of his defense at sentencing (*i.e.* without placing his counsel at serious risk of being exposed) which have resulted from the rapidly developing COVID-19 pandemic, and in support thereof would show the Court as follows:

**I.
Introduction**

Defendant, Cengiz Jan Comu ("Comu"), respectfully moves the Court for an order granting his temporary release to home confinement, subject to the conditions set forth herein. Comu, a pretrial defendant[1] currently detained at the Dallas County Jail, is among the group of people which the Center for Disease Control and Prevention "CDC") has categorized as the most at-risk for contracting COVID-19, a dangerous illness spreading rapidly across the world and through Texas.

The Bail Reform Act provides the statutory framework and guidance for decisions relating to the release or detention of federal defendants prior to being sentenced. *See* 18 U.S.C. § 3141, et

---

[1] Although Comu has entered guilty pleas to the charges alleged in the Superseding Indictment, those pleas have not yet been accepted by United States District Judge Kinkeade. Thus, as a precise matter, Comu is still subject to "pretrial" detention as opposed to "presentence" detention. However, to the extent that this status should change prior to the Court's ruling on this Motion, the undersigned would respectfully submit that Comu's temporary release to home confinement would likewise be warranted and permitted under the rules governing presentence release, namely 18 U.S.C. § 3143((a)(1).

Defendant's Emergency Motion for Temporary Release to Home Confinement Based Upon COVID-19 Pandemic
Page 1 of 17

seq. More specifically, Section 3142(i) of that Chapter sets out the requisite contents of detention orders issued following a detention hearing. *See* 18 U.S.C. § 3142(i). Pursuant to that subsection, after holding a detention hearing and issuing an order of detention, the "judicial officer may, by subsequent order, permit the temporary release of the person ... to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." *Id.* The current COVID-19 pandemic, as it relates to Comu, constitutes just such a "compelling reason." Specifically, the health risk posed to Comu by the COVID-19 pandemic is already heightened because of his advanced age. Moreover, the conditions at the Dallas County Jail, as described below, serve to further increase that already elevated risk.

Furthermore, as a result of the drastic measures being taken across the country in response to this pandemic, Comu's ability to prepare his defense at sentencing will be substantially impacted by his continued detention. Specifically, Comu will not be able to participate in the preparation of his defense at sentencing without placing his counsel at risk of exposure to the potentially life-threatening coronavirus. Due to the serious and life-threatening nature of the current health risk to Comu, in addition to the need to preserve his ability to prepare his defense without subjecting his counsel to risk of harm, temporary release to home confinement is warranted until the imminent danger of this pandemic has ended.

## II.
## Factual Background

### A. The Emerging COVID-19 Pandemic

As of March 18, 2020, the new strain of coronavirus which causes COVID-19 has infected over 203,700 people, leading to at least 8,218 deaths worldwide.[2] On March 11, 2020, the World

---

[2] *Coronavirus Map: Tracking the Spread of the Outbreak*, THE NEW YORK TIMES (Mar. 18, 2020), https://nyti.ms/2U4kmud (updating regularly).

Health Organization officially classified COVID-19 as a pandemic.[3] Shortly thereafter, on March 13, 2020, Governor Greg Abbott declared a State of Emergency in Texas. Since that time, countless and increasingly drastic protective measures have been taken including closing schools, limiting gatherings of 10 or more persons, postponing jury trials and other court settings, banning all in-restaurant dining and closing all bars in many counties, and implementing work-from-home policies across a vast segment of the nation's businesses, among others. As of March 16, 2020, the CDC has reported 7,038 cases of COVID-19 in the United States with 97 confirmed deaths.

The CDC has issued guidance advising that individuals at higher risk of contracting COVID-19—older adults and people with chronic medical conditions—take immediate preventative actions, including avoiding crowded areas and staying home as much as possible.[4] With confirmed cases in Dallas County that indicate community spread, we must take every reasonably available action to protect both vulnerable populations and the community at large.

### B. Conditions of Confinement and Spread of COVID-19

According to public health experts, incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe," resulting in the unavoidable reality that infection control is exceedingly difficult in these settings.[5] In other words, as set forth below, the conditions of Comu's current pretrial detention present an alarmingly ideal environment for the spread of COVID-19.

*Close Quarters Akin to a Cruise Ship or Nursing Home*

Much like the close quarters and confined nature of cruise ships and nursing homes, which

---

[3] *WHO Characterizes COVID-19 as a Pandemic*, WORLD HEALTH ORGANIZATION (Mar. 11, 2020), https://bit.ly/2W8dwpS.
[4] *People at Risk for Serious Illness from COVID-19*, CDC (Mar. 12, 2020), https://bit.ly/2vgUt1P.
[5] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (Mar. 2, 2020), https://bit.ly/2W9V6oS.

have been shown to lead to rapid and extensive spread of the illness, the Bureau of Prisons has observed that the "densely packed nature of prisons creates a risk of infection and transmission for inmates and staff."[6] Comparatively, however, jails and prisons are just "as dangerous as nursing homes and cruise ships, but far less sanitary."[7] Likewise, many prisoners lack regular access to critical sanitary resources, such as hand-washing, hand sanitizer, and showers. Other conditions, such as "the fact that ventilation behind bars is often poor, inmates sleep in close quarters and share a small number of bathrooms," further exacerbate the situation.[8] In short, jails and prisons constitute a perfect environment for the transmission of contagious disease, such as COVID-19.[9]

### *Inability to Institute Protective Measures Urged by CDC*

Even aside from the unsanitary conditions, jails and prisons simply don't have the ability to put into place the critical prevention methods urged by the CDC – staying six feet away from others, frequently washing hands, and routinely disinfecting surfaces. For instance, as one correctional officer pointed out, you "can't escort an inmate with a six-foot rule."[10] Thus, the increasingly important practice of "social distancing" is simply impossible in the context of jails and prisons. Rather, even in spite of recent efforts such as cessation of visitation in many facilities, it is inescapable that countless individuals come and go from jails and prisons each day. Inmates cycle in and out of detention facilities from all over the state and country, particularly in local jails (such as the Dallas County Jail), which serve as an initial holding facility for many newly arrested

---

[6] Danielle Ivory, *"We Are Not a Hospital": A Prison Braces for the Coronavirus*, THE NEW YORK TIMES (Mar. 17, 2020), https://www.nytimes.com/2020/03/17/us/coronavirus-prisons-jails.html.

[7] Jim Mustian and Joshua Goodman, *Get Out of Jail? Inmates Fearful of Virus Argue for Release: America's nearly 7,000 jails, prisons and correction facilities are an ideal breeding ground for the virus*, NBC DFW (Mar. 18, 2020), https://www.nbcdfw.com/news/coronavirus/get-out-of-jail-inmates-fearful-of-virus-argue-for-release/2333217/.

[8] *Id.*

[9] Joseph A. Bick (2007). Infection Control in Jails and Prisons. *Clinical Infectious Diseases* 45(8):1047-1055, https://doi.org/10.1086/521910.

[10] Ivory, *supra* note 6.

individuals. Likewise, correctional officers, the facility's medical providers, and other essential staff come in and out each day, potentially with limited or no screening.

### *Lack of Access to Medical Care or Supplies*

Much like the significantly limited access to sanitary measures, jails and prisons simply do not have the ability to provide the life-saving medical treatment that is often required in severe cases of COVID-19. Many of these facilities, where medical care is limited even at the best of times, simply do not have enough beds or sufficient staff to treat and/or quarantine the substantial number of patients that an outbreak would surely produce.[11] Likewise, many jails and prisons are facing severe shortages of critical protective equipment and supplies such as masks and gloves, leaving staff members exposed to a substantially increased risk.

At least one Texas staff member of the federal prison system has reported to the New York Times that their facilities are "ill-prepared for a coronavirus outbreak, or even a quarantine."[12] Specifically, that staff member reported that "medical supplies and staff were short, even without an outbreak" and that they "don't have ventilators on hand at all," concluding that "the prison simply would not be able to handle a surge."[13] As such, experts have warned that the "abrupt onset of severe covid-19 infections among incarcerated individuals will require mass transfers to local hospitals for intensive medical and ventilator care – highly expensive interventions that may soon be in very short supply."[14]

---

[11] Laura M. Maruschak et al. (2015). Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12. NCJ 248491. Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics, https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf.

[12] Ivory, *supra* note 6.

[13] *Id.*

[14] Josiah Rich, Scott Allen, and Mavis Nimoh, *We Must Release Prisoners to Lessen the Spread of Coronavirus*, THE WASHINGTON POST (Mar. 17, 2020), https://www.washingtonpost.com/opinions/2020/03/17/we-must-release-prisoners-lessen-spread-coronavirus/.

*Significant Numbers of High-Risk Prisoners*

Jails and prisons house a significant number of prisoners who are among those which the CDC has identified as most susceptible to falling severely ill with COVID-19, including the elderly and people with underlying medical conditions.[15] In fact, "[m]ore than 20% of the Texas prison population is over the age of 50, the most at-risk populations when it comes to the new coronavirus."[16] Additionally, data from the outbreak in China appears to show that "[m]en have died from coronavirus at nearly twice the rate of women," which is significant considering that the vast majority of prisoners are male.[17]

Taking into account these various factors, particularly when considered together, it appears highly likely that the close-quarters, unsanitary nature of jails and prisons, where available medical care and precautionary measures are notably limited, will inevitably prove to be a dangerous breeding ground for COVID-19.

C. **Growing Precedent of Jailhouse Outbreaks**

To be sure, the spread of contagious disease in jails and prisons is not a novel issue. For example, outbreaks of the flu occur regularly, and during the H1N1 epidemic in 2009, many jails and prisons dealt with high numbers of cases.[18] What is novel, however, is the much more aggressive and uncontrollable nature of the current pandemic. Unlike the flu, this illness has no vaccine and is spreading at an alarmingly higher rate. In China, officials have confirmed the

---

[15] *Joint Statement from Elected Prosecutors on COVID-19 and Addressing the Rights and Needs of Those in Custody* (Mar. 2020), https://fairandjustprosecution.org/wp-content/uploads/2020/03/Coronavirus-Sign-OnLetter.pdf?utm_source=The+Marshall+Project+Newsletter&utm_campaign=f1bf35014e-EMAIL_CAMPAIGN_2020_03_17_12_07&utm_medium=email&utm_term=0_5e02cdad9d-f1bf35014e-119797937.

[16] Jessica Priest, *Coronavirus in Texas: Prison Population at Risk of Outbreak*, STATESMAN (Mar. 14, 2020), https://www.statesman.com/news/20200314/coronavirus-in-texas-prison-population-at-risk-of-outbreak.

[17] Dennis Thompson, *Coronavirus Strikes Men, Older People the Hardest*, HEALTHDAY REPORTER (Feb. 28, 2020), https://www.usnews.com/news/health-news/articles/2020-02-28/coronavirus-strikes-men-older-people-the-hardest.

[18] *Prisons and Jails are Vulnerable to COVID-19 Outbreaks*, THE VERGE (Mar. 7, 2020) https://bit.ly/2TNcNZY.

coronavirus spreading at a rapid pace through Chinese prisons, counting more than 500 cases.[19] Iran is facing a similar crisis, prompting Secretary of State Mike Pompeo to call for the release of Americans detained there in light of the "deeply troubling" "[r]eports that COVID-19 has spread to Iranian prisons," noting that "[t]heir detention amid increasingly deteriorating conditions defies basic human decency."[20] In response to the outbreak of COVID-19 throughout its prisons, Courts across Iran have granted 85,000 inmates furlough as one of the numerous measures taken in an attempt to contain the spread of coronavirus across the country.[21] The significance of that decision is all the more evident when considered in light of the fact that Iran had a total of 189,500 people in prison prior to these releases, according to January report.[22]

Across the United States, numerous jurisdictions have already begun taking steps to reduce jail and prison populations, with the goal of minimizing the inevitable spread of COVID-19 amongst incarcerated individuals. In a recently issued joint statement, numerous elected prosecutors, including Dallas County District Attorney John Creuzot, have urged that the current pandemic presents a "pressing need … to dramatically reduce the number of incarcerated individuals."[23] Among other steps, Creuzot and others have advocated for the release of elderly and otherwise susceptible prisoners "immediately, unless doing so would pose a serious risk to the physical safety of the community."[24]

---

[19] Rhea Mahbubani, *Chinese Jails Have Become Hotbeds of Coronavirus As More Than 500 Cases Have Erupted, Prompting the Ouster of Several Officials*, BUSINESS INSIDER (Feb. 21, 2020), https://bit.ly/2vSzSRT.

[20] Jennifer Hansler and Kylie Atwood, *Pompeo Calls for Humanitarian Release of Wrongfully Detained Americans in Iran Amid Coronavirus Outbreak*, CNN (Mar. 10, 2020) https://cnn.it/2W4OpV7.

[21] Claudia Lauer and Colleen Long, *US Prisons, Jails On Alert for Spread of Coronavirus*, THE ASSOCIATED PRESS (Mar. 7, 2020) https://apnews.com/af98b0a38aaabedbcb059092db356697.

[22] Parisa Hafezi, *Iran Temporarily Frees 85,000 from Jail Including Political Prisoners*, REUTERS WORLD NEWS (Mar. 17, 2020), https://www.reuters.com/article/us-health-coronavirus-iran-prisoners/iran-temporarily-frees-85000-from-jail-including-political-prisoners-amid-coronavirus-idUSKBN21410M.

[23] *Joint Statement from Elected Prosecutors on COVID-19*, *supra* note 14.

[24] *Id.*

Defendant's Emergency Motion for Temporary Release to Home Confinement Based Upon COVID-19 Pandemic
Page 7 of 17

The Supreme Court of Washington recently issued an emergency order addressing the growing crisis that is the COVID-19 pandemic, ordering that "Courts shall hear motions for pretrial release on an expedited basis without requiring a motion to shorten time," and perhaps even more importantly, finding that "for those identified as part of a vulnerable or at-risk population by the Centers for Disease Control, COVID-19 is presumed to be a material change in circumstances, and the parties do not need to supply additional briefing on COVID-19 to the court."[25]

Many law enforcement officials have enacted similar measures to reduce jail populations, including by discouraging the admission of individuals arrested on non-violent charges. In New York, Brooklyn District Attorney Eric Gonzalez, joined by public health experts, has asked the Governor to grant emergency clemencies to elderly and sick prisoners.[26] In Cuyahoga County, Ohio, more than 200 inmates have been released amid concerns over COVID-19.[27] Regarding that decision, Administrative Judge Sheehan explained that they "are trying to make as much room as possible, so when this virus hits [thei]r jail, the jail can deal with these people, quarantine them and deal with it instead of letting them sit there and infect the whole entire jail."[28] Los Angeles County has followed suit, announcing plans to release inmates early and reduce their number of arrests.[29] Likewise, Collin County has enacted similar measures, urging law enforcement not to arrest non-violent or petty offenders, so as to reduce already high jail populations.[30]

---

[25] *In The Matter Of Statewide Response By Washington State Courts To The Covid-19 Public Health Emergency*, Order No. 25700-B-606, at 6 (Sup. Ct. Wash., Mar. 18, 2020), http://www.courts.wa.gov/content/publicUpload/Supreme%20Court%20Orders/Supreme%20Court%20Emergency%20Order%20re%20CV19%20031820.pdf.

[26] *See* Sarah Lustbader, *Coronavirus: Sentenced to COVID-19*, THE DAILY APPEAL (Mar. 12, 2020), https://theappeal.org/sentenced-to-covid-19/.

[27] Allen Kim and Anna Sturla, *Cities in the US Move to Lower Inmate Populations as Coronavirus Fears Grow*, CNN (Mar. 16, 2020), https://www.cnn.com/2020/03/16/us/inmates-released-jail-coronavirus-trnd/index.html.

[28] *Id.*

[29] *Id.*

[30] *See Facing Coronavirus Concerns, Collin County Sheriff Asks Police Not to Bring Petty Criminals to Jail*, THE DALLAS MORNING NEWS (Mar. 12, 2020), https://www.dallasnews.com/news/public-health/2020/03/12/facing-coronavirus-concerns-collin-county-sheriff-asks-police-not-to-bring-petty-criminals-to-jail/.

### D. Disastrous Consequences of Inadequate Preventative Measures

With respect to jails and prisons, in particular, the importance of taking sufficient preventative measures now is underscored by the frightening possibility that, in the event of any significant outbreak, they could very likely be facing a significant number of infected correctional officers and staff who are thus unable to work. Accordingly, Dr. Marc Stern, a physician and former top medical officer for the Washington State Department of Corrections, has urged that "jails and prisons should be planning for the possibility of not having enough staff," explaining that we "don't want to find one day that a number of officers have called in sick, and we're having trouble managing the institution."[31] Additionally, the success of "social distancing" practices is largely tied to the percentage of the population that is abiding by said practices, *i.e.* the more complete the participation, the more effective the practice. Thus, by placing the Defendant in home confinement where he can be completely cut off from outside access, the likelihood of "flattening the curve" becomes that much stronger. In short, although "corrections facilities cannot be closed, they must be included in any plan aimed at slowing the surge in infections and protecting public safety."[32] A critical component of including these facilities in such plans is reducing the overall number of prisoners, particularly those who are most at-risk.

### III.
### The Bail Reform Act Permits Comu's Release

A "judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or

---

[31] Martin Kaste, *Prisons And Jails Worry About Becoming Coronavirus 'Incubators'*, NPR (Mar. 13, 2020), https://www.npr.org/2020/03/13/815002735/prisons-and-jails-worry-about-becoming-coronavirus-incubators.
[32] Josiah Rich, Scott Allen, and Mavis Nimoh, *supra* note 14.

for another compelling reason." 18 U.S.C. § 3142(i). In this case, significantly changed circumstance exists, namely the global COVID-19 pandemic spreading rapidly through Dallas County, which warrants reconsideration of Comu's detention. Specifically, the severe, potentially life-threatening health risk posed by the COVID-19 pandemic to an older individual such as Comu constitutes a compelling reason to authorize his temporary release to strict home confinement.

In light of the crucial liberty interests involved, it therefore follows that a "case-by-case" approach is required at any stage of the case in assessing the propriety of pretrial detention. *See United States v. Gonzales Claudio*, 806 F.2d 334, 340 (2d Cir. 1986) (discussing due process analysis for evaluating propriety of prolonged pretrial detention, and the interests at stake) (citations omitted), *cert. dismissed sub nom.*, *Melendez-Carrion v. United States*, 479 U.S. 978 (1986). In conducting such an analysis, courts are to consider the "total harm and benefits to prisoner and society" that continued pretrial imprisonment would yield in the context of the particular circumstances at issue in a given case, such as the rapidly encroaching COVID-19 pandemic here. *See Davis v. Ayala*, 135 S. Ct. 2187, 2209 (2015) (Kennedy, J., concurring) (calling for heightened judicial scrutiny of the projected impact of jail and prison conditions on a defendant).

### *The COVID-19 Pandemic Constitutes a Compelling Reason*

The potential harm to society which could result from Comu's continued detention is quite severe. Without critical measures such as reducing incarcerated populations (which can be achieved by releasing at-risk, non-violent individuals, such as Comu), "the novel coronavirus will spread rapidly in our jails and prisons, endangering not only prisoners and corrections workers but the general public as well."[33] Importantly, that danger consists of more than simply the increased

---

[33] *Id.*

exposure and spread which would result from correctional officers going back and forth between detention facilities and the community. That danger also entails the undoubted need for prisoners to be transported to hospitals to receive life-saving treatments not available in jails or prisons, such as ventilators, thereby reducing the availability of these treatments to the public and increasing demand on these already scarce resources.[34]

As a result of these ever-increasing risks, combined with the highly susceptible nature of the Dallas County Jail to an outbreak of this highly contagious illness, the current pandemic constitutes a very compelling reason for Comu's temporary release. In fact, the critical nature of this pandemic and particular its impact in the context of a crowded detention facility, has been recognized by other courts. *See, e.g., United States v. Raihan*, No. 20-cr-68 (BMC) (JO), Dkt. No. 20 at 10:12–19 (E.D.N.Y. Mar. 12, 2020) (deciding to continue a criminal defendant on pretrial release rather than order him remanded to the Metropolitan Detention Center due, in part, to the Magistrate Judge's recognition of the fact that "[t]he more people we crowd into that facility, the more we're increasing the risk to the community"). By allowing Comu – a particularly vulnerable individual at the age of 59, with significant recent health issues – to be released to home confinement, the Dallas County Jail would be one step closer to having sufficient resources to be able to deal with an almost certainly imminent COVID-19 outbreak, and the public would likewise be one step closer to achieving the necessary level of participation in "social distancing" to allow for a "flattening of the curve" and eventual control over the outbreak.

With respect to the Comu, the potential harm of continued pretrial detention is quite simple – the increasingly likely risk that he will contract the highly contagious coronavirus, which could very likely prove severe and life-threatening, considering his status among those most vulnerable,

---

[34] *Id.*

not to mention the increased risk posed by the conditions of his detention. For instance, the Defendant reports that his current tank (the KT3A pod), although designed to hold a maximum of thirty (30) prisoners, is currently occupied by sixty-four (64). In the face of a highly contagious pandemic, that is precisely the type of circumstance that puts prisoners at a dramatically increased risk. Moreover, news reports indicate that at least one BOP staff member in Grand Prairie, Texas has tested positive for the coronavirus, further underscoring the imminent nature of this threat.[35]

Notably, United States District Judge Allison J. Nathan has recently recognized the compelling nature of the current health risk, noting that "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic has become apparent," and granting a defendant's motion for temporary release to home confinement based, in part, on that growing pandemic, which the court found to constitute a "compelling reason." *United States v. Stephens*, No. 15-cr-95, at 1 (S.D.N.Y., Mar. 18, 2020). The court emphasized the importance of this "compelling reason," noting that "even if [it] were to conclude that changed circumstances did not compel reconsideration of the Defendant's bond conditions, [the] separate statutory ground advanced by the Defendant [(18 U.S.C. § 3142(i))] would require his release here." *Id.* at 4.

### *Release Is Necessary to Avoid Severe Health Risk to Comu's Counsel*

In addition to posing a significant health risk to Comu, the COVID-19 pandemic has also resulted in such a dramatically restricted state of affairs as to render it impossible for him to participate in the preparation of his defense at sentencing without subjecting his counsel to a very real and imminent risk of harm. In light of the current measures being taken in Dallas County (and across the country) pursuant to state of emergency declarations, namely the current prohibition of any gatherings over fifty (50) people and calls for strict observation of "social distancing," the

---

[35] Jim Mustian and Joshua Goodman, *supra* note 7.

risks associated with Comu's counsel traveling to the Dallas County Jail to visit him are simply too high to bear.

Not only would such visits pose a significant risk to the health of Comu's counsel in the sense that it would force them to violate the current "social distancing" protocols, but more importantly, it would also force them to spend hours at a time in the Dallas County Jail visiting facilities, which have undoubtedly not been sufficiently sanitized. Considering that the virus can survive on plastic and steel for up to 72 hours, effective cleaning is near impossible without constant attention, meaning that those facilities are highly likely to be infected with the virus.[36] In other words, to do so would be akin to boarding a cruise ship without any protective gear or precautions. Moreover, by visiting the Dallas County Jail, Comu's counsel would be further increasing the risk to Comu, as well as all of the other inmates and staff in that facility, by increasing contact with the outside population and potentially passing on the virus.

Under these exceptional circumstances, release to home confinement is necessary in order to allow Comu to participate in the preparation of his defense at sentencing without placing his counsel at risk. In fact, in the aforementioned order issued by District Judge Allison in *United States v. Stephens*, the court recognized this issue as a valid "compelling reason" for a defendant's temporary release, specifically citing "the obstacles the current public health crisis poses to the preparation of the Defendant's defense" in reaching its conclusion that the defendant's temporary release was warranted on the basis of a compelling reason under 18 U.S.C. § 3142(i). *Id.* at 5.

Taking into account the benefits which would accrue not only to Comu, but to the community (in the form of increased "social distancing" participation) and to the Dallas County Jail (in the form of progress towards a sufficiently reduced population so as to enable a reasonable

---

[36] Apoorva Mandavilli, *How Long Will Coronavirus Lice on Surfaces or in the Air Around You?*, THE NEW YORK TIMES (Mar. 17, 2020), https://www.nytimes.com/2020/03/17/health/coronavirus-surfaces-aerosols.html.

ability to combat the spread of COVID-19), as well as the importance of his ability to participate in his defense at sentencing without placing his counsel at risk of harm, Comu's temporary release to home confinement is warranted, subject to the conditions set out below.

## IV.
## Conditions of Release Are Available that Would Allow Comu to Be Treated Humanely While Also Ameliorating Any Danger to the Community

From Comu's perspective, the current circumstances present a dramatically different scenario from that which existed at the time of his detention, in the sense that his very *life* is on the line. His potential release to home confinement is no longer a matter of comfort or convenience, but rather one of a life-threatening nature. As a result, Comu is well aware that if he were to violate any condition of release, he would not only be forfeiting his liberty, but would be forfeiting his best possible hope of avoiding this highly contagious and potentially deadly outbreak. This imminent and very real risk of contracting the potentially fatal coronavirus serves as a powerful incentive to abide by any conditions, which, in addition to the other changes discussed below, results in a substantially different calculus than was previously present in this case as to Comu's likelihood of abiding by his conditions.

Accordingly, Comu respectfully submits that the following conditions would be sufficient, but not greater than necessary to ensure his presence and the safety of the community:

1. **Home Detention**: The Defendant shall be subject to Home Detention, restricting him to the confines of his residence at all times except for urgent medical treatment; court appearances; court-ordered obligations; or other activities approved in advance by the pretrial office or supervising officer;

2. **No Internet Use**: The Defendant shall not access the internet for any purpose, including the use of any email account, and shall comply with any and all monitoring requirements employed or imposed by the United States Probation Department to ensure compliance with such restrictions;

3. **Prior Conditions**: The Defendant shall be subject to all previously ordered conditions of release; and

4. **Additional Conditions**: The Defendant shall be subject to any and all other conditions which the Court determines to be appropriate.

These conditions, with the inclusion of the requirement that Comu's abstain from any use of the internet, would address any previous concerns that he might attempt to engage in any conduct relating to the sale of securities in that this condition would eliminate the only means through which he could hypothetically do so. Additionally, the circumstances relating to the Comu's involvement in EarthWater have changed dramatically since the time of his return to custody. The effects of these changes, alone, would almost certainly preclude him from being able to successfully engage in any conduct relating to EarthWater, even if he were to have access to the internet. Namely, Comu has entered guilty pleas to every count charged in the Superseding Indictment, which has been made public record and he has been publicly sued in civil court by an EarthWater investor. Moreover, he has resigned from any and all roles at EarthWater. As a result, it is difficult to imagine how he could actually affect any action with respect to EarthWater.

For the reasons set forth above, Comu respectfully submits that in light of these significantly changed circumstances, the foregoing conditions of release to home confinement would be sufficient, but not greater than necessary, to "reasonably assure—not guarantee—the appearance of the person as required and the safety of any other person and the community." *United States v. Fortna*, 769 F.3d 243, 250 (5th Cir. 1985).

## V.
## Conclusion

Comu is among the especially vulnerable population facing a heightened risk not only of contracting the coronavirus, but also of developing a severe, even life-threatening case if he were to become infected. As a result, if subjected to continued pretrial detention amid the onset of this novel and aggressive pandemic, Comu would face a very real risk of life-threatening illness while

being held in a facility that is simply not equipped to address such an outbreak. This risk far exceeds any reasonable or ordinary condition of detention and constitutes a compelling reason for Comu's temporary release to strict home confinement, subject to conditions. For each of these reasons and all of those set forth above, the Defendant respectfully requests that he be temporarily released to temporary home confinement until the significant health risk posed by the current COVID-19 pandemic has passed.

    Respectfully submitted,

    */s/ Alexandra Hunt*
    **ALEXANDRA HUNT**
    Texas Bar No. 24095711
    2515 McKinney Avenue
    Chateau Plaza, Suite 940
    Dallas, Texas 75201
    Telephone:  214-720-4040
    Email:  ahunt@sorrelshagood.com

    **DANIEL K. HAGOOD, P.C.**
    Texas Bar No. 08698300
    2515 McKinney Avenue
    Chateau Plaza, Suite 940
    Dallas, Texas 75201
    Telephone:  214-720-4040
    Email:  dhagood@sorrelshagood.com

    **BRIAN D. POE**
    Texas Bar No. 24056908
    909 Throckmorton Street
    Fort Worth, TX 76102
    Telephone:  817-870-2022
    Email:  bpoe@bpoelaw.com

    **COUNSEL FOR DEFENDANT COMU**

## CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of March, 2020, a true and correct copy of the foregoing document was filed with the Clerk of the Court for the United States District Court, Northern District of Texas using the electronic case filing system, which provides for service upon all counsel of record.

                                         */s/ Daniel K. Hagood*
                                         DANIEL K. HAGOOD, P.C.

## CERTIFICATE OF CONFERENCE

I hereby certify that on the 19th day of March, 2020, I conferred with DOJ Trial Attorney Christopher Fenton regarding the above and foregoing motion and that he is opposed to the same.

                                         */s/ Daniel K. Hagood*
                                         DANIEL K. HAGOOD, P.C.