IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>　　　　　　Plaintiff, | |
| v. | No.　3:19-cr-112-K |
| CENGIZ JAN COMU,<br>　　　　　　Defendant. | |

**RESPONSE IN OPPOSITION TO DEFENDANT'S
EMERGENCY MOTION TO REVOKE DETENTION ORDER**

Defendant Cengiz Jan Comu moves this Court to temporarily release him based on the speculative prospect of an uncontained COVID-19 outbreak in the facility in which he is currently detained – Dallas County Jail. Such speculation does not undermine detention under 18 U.S.C. § 3142(e) nor justify temporary release under 18 U.S.C. § 3142(i). Comu's arguments ignore the facts justifying his detention; they overlook the Bureau of Prisons and Dallas County Jail's aggressive preparations for COVID-19; and they would endorse the mass release of pre-trial detainees into the community – jeopardizing, rather than promoting, public health and safety. At least two district courts have already rejected this type of argument because the general prospect of infection by the novel coronavirus does not supersede the statutory considerations of 18 U.S.C. § 3142. *See United States v. Martin*, No. PWG-19-140-13, 2020 WL 1274857, at *3 (D. Md. Mar. 17, 2020) (denying relief and noting that, "as concerning as the COVID-19 pandemic is, resolving an appeal of an order of detention must in the first instance be an individualized assessment of the factors identified by the Bail Reform Act"); *United States v. Lewis*, No. 19-cr-34, Order and

Reasons (ECF No. 150) (E.D.La.) (denying motion for temporary release based on defendant's speculation that he may contract COVID-19).[1]

Moreover, as both the Magistrate and District Court previously concluded, Comu is a danger to the community, particularly to the elderly population who are most at-risk for contracting COVID-19. Comu is an unrepentant and undeterred confidence man. Even after he was arrested and ordered to stop promoting securities, he continued to target the same elderly victims of the fraud for which he was indicted, using the same false and misleading statements, and the same *modus operandi*. Were he to be released amidst the COVID-19 pandemic, he would pose an even greater danger to his elderly victims and other vulnerable individuals. Comu previously promoted EarthWater as a "magical" treatment for HIV and cancer. Comu could easily rebrand his EarthWater pitch to include COVID-19 among the list of serious diseases EarthWater purportedly cures and use his wife's email and telephone from the comfort of his home detention to continue the fraud.

Now that Comu has pled guilty to all 23 counts of the superseding indictment against him, Comu's circumstances have changed substantially in favor of detention. He poses a more serious risk of flight than he did at any prior point when detention has been considered. He is scheduled to be sentenced in four months, and, as he admitted in his motion, considers incarceration to be equivalent to a death sentence. It is obvious that Comu, who is likely facing a

---

[1] *See also See United States v. Rodriguez*, CR 11-148-JTS, Order (ECF No. 2021) (C.D.C.A. Mar. 21, 2020) (denying a similar motion where Court found that "there have been no reported cases of Covid-19 at the facility where [defendant] is housed" and "[BOP] has taken substantial steps to mitigate the effects of the pandemic"); *United States v. Gileno*, No. 3:19-CR-161-(VAB)-1, 2020 WL 1307108, at *4 (D. Conn. Mar. 19, 2020) (denying motion to modify sentence imposed on defendant who pled guilty to wire fraud and tax evasion, on grounds that defendant failed to show that BOP's preparations to manage the COVID-19 pandemic are insufficient or that the facility is unable to adequately treat the defendant).

significant sentence of imprisonment, has nothing left to lose. Were he to be released, there is a serious risk he will flee to his native country of Canada or abscond within the United States, where otherwise occupied first responders would have neither the time nor resources to search for him.

The Court should deny Comu's motion.

## FACTUAL AND PROCEDURAL BACKGROUND

On May 8, 2019, Comu was arrested after being indicted for his role as the leader of a high-yield investment fraud scheme that targeted elderly victims. On May 13, 2019, at his pretrial hearing, Magistrate Judge Rutherford released Comu on the conditions that Comu was prohibited from: (i) communicating with witnesses and victims in this case; and (ii) selling, promoting, or advising on the purchase or sale of securities. The government subsequently learned that, just a few short weeks after his release, Comu had violated the conditions of his release by launching a months-long campaign to raise millions of dollars by promoting and selling securities and, on November 1, 2019, moved to revoke Comu's bond and detain him. (ECF No. 110.)

On November 8, 2019, following a hearing, Judge Rutherford revoked Comu's pretrial release and ordered him detained. (ECF No. 136.) Judge Rutherford found that there was clear and convincing evidence showing that Comu had repeatedly violated the conditions of his release. Comu's efforts were extensive, involving dozens of calls, emails, meetings and exchanges of draft documents. He used the same false and misleading statements alleged in the indictment. He even targeted the victims of the fraud for which he was criminally charged and was then awaiting trial. The evidence further demonstrated Comu undoubtedly knew what he was doing was wrong and violated the conditions of his release: he actively attempted to avoid detection by asking a

3

prospective counter-party to agree not to disclose the proposed stock sale or its terms to the Department of Justice or the U.S. Attorney's Office.

Judge Rutherford also found that the extensive, repeated and deceptive nature of Comu's violative conduct, as well as his demonstrable track record of violating court orders and abusing the judicial process, established by a preponderance of the evidence that Comu is unlikely to abide by any conditions of release and should be detained.

On November 22, 2019, Comu filed a motion asking Judge Rutherford to reconsider her detention order. (ECF No. 162.) His primary argument was that the stock deals he negotiated did not actually involve the sale of securities and that, even if they did, he did not understand that negotiating those deals violated the Court-ordered prohibition on selling, promoting or advising on the purchase or sale of securities. (*Id*. at 3-13.) Comu also argued, for the first time, that he was in need of urgent medical treatment for his eye and should be released to home confinement so that he may receive it from his personal physician. (*Id*. at 15-16.)

On December 23, 2019, following a hearing and extensive briefing from both parties, Judge Rutherford entered an order denying Comu's motion for reconsideration. (ECF No. 198.) Among other things, Judge Rutherford found that Comu had been transferred to Dallas County Jail so that he could receive medical treatment from Parkland Hospital and that there was no reliable medical evidence that Comu was suffering from a specific, exigent condition or complication that could not be adequately treated by Parkland Hospital while he is in custody. Notably, in the course of resolving his motion for reconsideration, Comu refused to sign a medical release so that the government or the Court could confirm his medical needs and his counsel told the government she did not believe it was in Comu's best interest to do so. (ECF No. 190 n.2.)

On January 3, 2020, Defendant asked the District Court to revoke or set aside Judge Rutherford's detention order and release him. (ECF No. 213.) On February 4, 2020, Judge Kinkeade entered an order denying Defendant's motion and affirming Judge Rutherford's detention order. (ECF No. 232.) After conducting a *de novo* review of the transcript, briefs, underlying orders, and relevant portions of the record, Judge Kinkeade determined that all the factors set forth in Section 3142(g) of the Bail Reform Act weigh in favor of detention.

Among other things, Judge Kinkeade found that Comu's release would pose a serious danger to the community "[b]ecause Comu targets elderly individuals and demonstrated an intent to continue to do so, … If released, even to house arrest, the Court has no reason to believe Comu's representations that he will not once again attempt to perpetrate the fraud." (*Id*. at 9.) According to Judge Kinkeade, "a release to house arrest would give Comu access to email and telephone service, the only tools needed to continue the scheme." (*Id*. at 7.)

Judge Kinkeade also found that "[t]here is no reason to believe that, if the Court released Comu on conditions, he would abide by any of them." (*Id*. at 9.) Judge Kinkeade's finding was based on Comu's "history of flagrant disregard for the judicial process":

> Comu was permanently barred from selling unregistered securities in 1989, due to a scheme unrelated to Earthwater, and continued to do so with the Earthwater transactions. Judge Jernigan, in an opinion on Comu's bankruptcy estate, noted that Comu obtained a discharge "through widespread fraud, including the deliberate concealment of assets and significant and numerous false oaths." Finally, Comu chose to flagrantly disregard Judge Rutherford's order to refrain from advising or promoting the sale of securities. Three completely different actions, three different judges, and three examples of Comu's complete disregard for the judicial process.

(*Id.* at 8-9 (internal citations omitted).)

On March 10, 2020, Comu pled guilty to all 23 counts alleged in the indictment against him. Comu's sentencing is scheduled for July 8, 2020. Based on the government's calculations, Comu's offense level is greater than 43 and his Guidelines range is life.

## ARGUMENT AND ANALYSIS

**I.  UNDER 18 U.S.C. § 3142, DEFENDANT'S DETENTION IS APPROPRIATE: HE REMAINS A SERIOUS DANGER TO THE COMMUNITY AND IS NOW ALSO A SERIOUS FLIGHT RISK.**

The defendant was held pursuant to Section 3142(e) after the factors outlined by Section 3142(g) demonstrated that he posed a danger to the community and was unlikely to abide by any conditions of release.  Comu offers no new facts changing the Court's prior analysis.  Nor could he.  The facts underlying Judge Kinkeade's February 4, 2020 order affirming Comu's detention remain true six weeks later:  (i) Comu targets elderly victims and has demonstrated an intent to continue to do so; (ii) there is no reason to believe house arrest will prevent Comu from continuing to perpetrate such crimes; and (iii) Comu's history of flagrant disregard for the judicial process shows there is no reason to believe that, if the Court released Comu on conditions, he would abide by any of them (or that any representations he makes that he would abide can be trusted).  As a result, Comu remains a danger to the community that cannot be contained by any conditions of release.  As the Bail Reform Act recognizes, he should remain detained pending trial.  18 U.S.C. § 3142(e)(1).

Far from justifying his release, the COVID-19 pandemic only makes Comu's targeted victims more vulnerable to the danger he poses.  In the past, Comu marketed EarthWater as the manufacturer of a "magical" tonic or "miracle" remedy that could be used to treat serious illnesses like HIV or cancer.  For example, when promoting EarthWater stock, Comu claimed that EarthWater's beverage was "a unique source of water that comes from a secret deposit in the USA containing over 70 trace minerals that have resulted in magical and remarkable results from radical improvement in health of body functions, to reduction in illness, Alzheimer's, Psoriaris, and HIV." (*See* Exhibit A.)  Comu also promoted claims that EarthWater was responsible for the remission of Stage 4 Leukemia.  (*See* Exhibit B.)  The current crisis presents Comu the opportunity to rebrand

6

EarthWater as a "miracle" remedy for COVID-19 and target the elderly who are most at-risk for contracting the virus and may be compelled to invest in such a company in exchange for product samples.[2]

Moreover, even if released to house arrest, Comu would still have access to the only tools needed to continue the scheme – email and telephone service. (ECF No. 232 at 7.) *See also Martin*, 2020 WL 1274857, at *4 (denying defendant's request to be released to home confinement where defendant speculated that he may contract COVID-19 while in custody, and explaining that, "[w]hile the location monitoring that he proposes may offer useful information about where he is, it provides little useful information about what he is doing, and the ready accessibility of smart phones and digital communication devices would make it all too easy for him to resume his involvement (directly or through confederates) in the distribution of controlled substances without detection."). Comu's claim that he will not access the internet if released, (ECF No. 253 at 14), provides little comfort. While previously in federal detention, he carried out his scheme by telephone, something a bar on Internet usage would do nothing to prevent. Not only that, he did it on a *monitored* telephone line. Even if this Court were to order Comu's Internet usage monitored, therefore, his prior conduct demonstrates this would serve little deterrence. Moreover,

---

[2] In his brief, Comu suggests that the public nature of his guilty plea and the fact that he resigned as the CEO of EarthWater somehow limits his ability to use EarthWater to defraud new victims. (ECF No. 253 at 15.) Comu's past conduct demonstrates that is not the case. In the recent past, Comu attempted to defraud elderly victims while in federal custody, while on a telephone line that he knew to be recorded, and after having been publicly indicted for conspiracy and fraud using EarthWater. He easily spun a story that he was the victim of a beverage industry conspiracy to explain away the charges and convince his victims to give him more money. (ECF No. 110 at 3-5.) In addition, as the government explained in prior submissions, Comu's legal title is irrelevant to his ability to sell EarthWater stock, especially the shares in the name of other entities that he controls. In any event, Comu could just change the name of the company, as he was planning to do when he was caught violating the conditions of his release by negotiating a deal to sell all of EarthWater's stock to a new company and continue 'operations' under a new name. (*Id*. at 6-9.)

7

while at home, Comu's wife would be present—an individual not subject to monitoring or restrictions by this Court. Comu could easily carry out his scheme by using his wife's email address or telephone, or any new telephone or device his wife may buy for him.

Comu now also presents an even more serious flight risk that he previously did. In November 2019, when he was first detained, Comu was still holding the presumption of innocence with the opportunity to contest the government's evidence against him. Now, he has pled guilty to 23 counts of conspiracy, mail fraud, wire fraud, and money laundering, and is likely facing a substantial term of incarceration after his sentencing in four months. He tells this Court he views incarceration as effectively a death sentence. (ECF No. 253 at 14.) Given these circumstances and his stated belief, it is absolutely clear Comu has every reason to flee, and nothing left to lose.

Moreover, as previously demonstrated, Comu no doubt has the resources to flee and strong connections to Canada. He is a Canadian citizen and has family in Canada that has demonstrated their willingness to provide resources to Comu when he asks—for example, by refilling his commissary funds while incarcerated. Although travel restrictions make certain types of flight more difficult, many means of transport to Canada exist.

In addition, flight risk is not limited to a defendant physically leaving a jurisdiction; it looks to whether a defendant can be trusted to "appear" "as required." 18 U.S.C. § 3142(e). During a time when community and law-enforcement resources are devoted to fighting COVID-19, it is easier for a motivated defendant to abscond. Just as a defendant's access to resources increases his risk of flight, so too does law enforcement's lack of access to resources to safeguard against defendant's flight. *See* 18 U.S.C. § 3142(g)(3)(A) (requiring consideration of the defendant's "financial resources"); *United States v. Townsend*, 897 F.2d 989, 996 (9th Cir. 1990) (considering defendants' "access to substantial sums of cash").

## II.   DEFENDANT IS INELIGIBLE FOR TEMPORARY RELEASE UNDER SECTION 18 U.S.C. § 3142(i).

Comu is likewise ineligible for temporary release under 18 U.S.C. § 3142(i). Under 18 U.S.C. § 3142(i), a judicial order may "permit the temporary release" of a defendant "to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." Comu bears the burden to show that temporary release is necessary under this provision. *United States v. Dupree*, 833 F. Supp. 2d 241, 246 (E.D.N.Y. 2011). Release under Section 3142(i) is intended for "extraordinary circumstances." *See United States v. Rebollo-Andino*, 312 Fed. App'x 346, 348 (1st Cir. 2009).

Comu seeks release under Section 3142(i) on two grounds: first, he claims a "compelling reason" in the speculative risk that COVID-19 may infect someone in his detention facility and expose him to the virus, (ECF No. 253 at 10-12); and second, he claims it is necessary for the preparation of his defense at sentencing because his attorney cannot visit him, (*id.* at 12-14). Neither of these reasons provides a basis for release under Section 3142(i).[3]

### A.   The Speculative Risk That Defendant May Contract COVID-19 Is Not a Compelling Reason Justifying Release.

By asking for temporary release based solely on the speculation that someone in his detention facility may contract COVID-19 and that he may later be exposed to it, Comu is asking this Court to adopt the position that the mere existence of the COVID-19 pandemic justifies release. Adopting the defendant's proposed position would mean *every* detainee must be

---

[3] As soon as this Court accepts Comu's guilty plea and he has been "found guilty," he no longer cannot seek release under Section 3142(i) and he must be detained "unless the judicial officer finds by clear and convincing evidence that [he] is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c)." Comu makes no attempt to satisfy this showing, nor could he given the evidence described above and in previously filings and hearings addressing the danger he poses, the risk he will flee, and the unlikelihood of him abiding by any conditions of release.

9

released—including those that have admitted to serious crimes carrying serious sentences like the defendant.  Comu offers no limiting principle.  While the COVID-19 pandemic poses unprecedented challenges and risks to the global community, the United States is still a nation of laws and the community must be protected to the extent possible from all dangers, both those posed by the current public health crisis and those posed by defendants like Comu, who have been found to present a serious danger to the community that cannot be controlled if he is not detained.

Despite numerous courts now facing motions like Comu's, the government has found no court in this country that has thus far found the COVID-19 pandemic alone to justify releasing a defendant, where the defendant has been found to pose a danger to the community and to be unlikely to abide by any conditions of release.  Comu suggests that a court in the Southern District of New York has found the health risks of COVID-19 alone to constitute a sufficiently "compelling reason" under Section 3142(i).  (*See* ECF No. 253 at 12 (citing *United States v. Stephens*, No. 15-cr-95-AJN, 2020 WL 1295155, at *3 (S.D.N.Y. Mar. 19, 2020)).)  The defendant fails to tell this Court, however, that the court in that case expressly did *not* make any finding as to whether COVID-19 alone was sufficient.  *See Stephens*, 2020 WL 1295155 at *3 n. 3 ("The Defendant also argues that the current public health crisis itself provides an additional compelling reason necessitating his release for all the reasons already articulated above.  The Court need not decide this additional factor here because its determination that release is necessary for the preparation of the Defendant's defense is sufficient under § 3142(i)." (internal citations omitted)).

Moreover, although courts have occasionally found a defendant's *specific* serious medical condition to justify temporary release, Comu does not identify any such condition here, *compare United States v. Birbragher*, No. 07-CR-1023, 2008 WL 1883504, at *2 (N.D. Iowa Apr. 25, 2008) (collecting cases regarding serious medical issues justifying temporary release, such as a terminal

10

AIDS diagnosis or life-threatening gunshot wounds). Instead, he relies on the speculative possibility that another person might cause him to become infected and makes broad claims that jails and prisons generally are not equipped or able to control the spread.

Courts have already rejected such broad and speculative claims in other districts with respect to COVID-19, especially where facilities are actively taking steps to prevent and control the virus. *See Martin*, 2020 WL 1274857, at *4 (explaining "that the correctional and medical staff at [the facility where the defendant is detained] are implementing precautionary and monitoring practices sufficient to protect detainees from exposure to the COVID-19 virus"); *Gileno*, 2020 WL 1307108, at *4 ("With regard to the COVID-19 pandemic, [the defendant] has also not shown that the plan proposed by the Bureau of Prisons is inadequate to manage the pandemic within [the defendant's] correctional facility, or that the facility is specifically unable to adequately treat Mr. Gileno. … [A]t this time the Court cannot assume that the Bureau of Prisons will be unable to manage the outbreak or adequately treat [the defendant] should it emerge at his correctional facility while he is still incarcerated."); *Rodriguez*, Order (ECF No. 2021) at 1-2 (denying relief because, among other things, "[BOP] has taken substantial steps to mitigate the effects of the pandemic" and COVID-19 "affects all citizens, … not simply those incarcerated.").

The Court should similarly reject Comu's attempt to obtain release on such generalized and speculative claims here. Indeed, Comu ignores that officials are taking precautions to protect against and mitigate any spread of COVID-19.

For instance, BOP has been planning for potential COVID-19 transmissions since January 2020. And, on March 13, 2020, BOP announced that it was implementing the Coronavirus (COVID-19) Phase Two Action Plan ("Action Plan")[4] in order to minimize the risk of COVID-19

---

[4] The Action Plan is available at: https://www.bop.gov/resources/news/20200313_covid-

transmission into and inside its facilities. The Action Plan comprises several preventive and mitigation measures, including:

- Screening of Inmates and Staff: All new BOP inmates are screened for COVID-19 symptoms and risk of exposure. Asymptomatic inmates with a documented risk of exposure will be quarantined; symptomatic inmates with documented risk of exposure will be isolated and tested pursuant to local health authority protocols. In areas with sustained community transmission, all facility staff will be screened for self-reported risk factors and elevated temperatures. Moreover, BOP staff registering a temperature of 100.4 degrees (or higher) will be barred from the facility on that basis alone.

- Quarantine Logistics: The Action Plan directs all BOP institutions to assess their stockpiles of food, medicines, and sanitation supplies and to establish quarantine areas within their facilities to house any detainees who are found to be infected with or at heightened risk of being infected with COVID-19 under the screening protocol outlined above.

- Suspension of Social Visits and Tours: BOP has placed a 30-day hold on all social visits, such as visits from friends and family, to limit the number of people entering the facility and interacting with detainees. To ensure that familial relationships are maintained, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities have also been suspended for at least the next 30 days.

- Suspension of Legal Visits: BOP also has placed a 30-day hold on legal visits, though such visits will be permitted on a case-by-case basis after the attorney has been screened for infection under the screening protocol outlined above.

- Suspension of Inmate Movements: BOP also has ceased the movement of inmates and detainees among its facilities for at least the next 30 days. Though there will be exceptions for medical treatment and similar exigencies, this precaution will prevent transmissions between institutional populations.

- Modified Operations: Finally, the Action Plan requires wardens at BOP facilities to modify operations in order to maximize social distancing.

As for local pretrial detention facilities the Marshals Service contracts with, each has their own internal procedures as to how they are dealing with the COVID-19 virus and are following CDC guidelines. Each facility has updated their intake procedures, which includes screening each new inmate for the COVID-19 symptoms, and will deny entry into their facility if an inmate

---

19.jsp.

demonstrates any symptoms. In addition, Dallas County Jail has suspended all in-person jail visitations (except for those with legal counsel,)[5] and is offering video visitation free of charge, prohibiting individuals from turning themselves in at the lobby, and postponing all department training sessions.[6] Moreover, Dallas County Jail is adjacent to Parkland Hospital, whose medical staff is available to treat detainees should they become ill.

Taken together, these measures should sharply mitigate the potential risks of COVID-19 transmission within Dallas County Jail. They have proven effective to date. As of the time of this filing, there is no evidence that anyone at Dallas County Jail has COVID-19. Comu provides no evidence that those protocols are insufficient or that the medical care available at the adjacent Parkland Hospital is inadequate. *See United States v. Rodriguez*, 50 F. Supp. 2d 717, 722 (N.D. Ohio 1999) (reasonably necessary treatments are available in prison, and often times a prison setting will provide superior care than a defendant can obtain on the outside).[7] Therefore, in light of officials' efforts and precautions, Comu has not made a factual record that his potential medical needs cannot be met during detention.

---

[5] *See* https://www.nbcdfw.com/news/local/dallas-county-sheriff-cancels-jail-visitation-due-to-coronavirus-concerns/2329660/.

[6] *See* ECF No. 253 at n. 30 (citing *Facing Coronavirus Concerns, Collin County Sheriff Asks Police Not to Bring Petty Criminals to Jail*, The Dallas Morning News (Mar. 12, 2020), https://www.dallasnews.com/news/public-health/2020/03/12/facing-coronavirus-concerns-collin-county-sheriff-asks-police-not-to-bring-petty-criminals-to-jail/.

[7] *See also United States v. Stanford*, 722 F. Supp. 2d 803, 813 (S.D. Tex. 2010) ("As the United States points out, Stanford is not the first pretrial detainee to suffer health issues. The FDC is well equipped to provide appropriate medical attention to detainees who may require it. Moreover, Stanford cites no case in which a defendant detained pending trial was entitled to release from detention because he may have suffered infirmities while detained.").

Moreover, Comu's claim that he "is among the group of people which the [CDC] has categorized as the most at-risk for contracting COVID-19" (ECF No. 253 at 1-3, n. 4), is not true. According to the CDC, the most at-risk group for severe illness from COVID-19 are: (i) people 65 years and older; and (ii) people with underlying medical conditions, such as like HIV, heart disease, diabetes, and lung disease.[8]  Comu is neither.  Comu is only 59 years old and, as far of the government is aware, does not have any of the underlying medical conditions that the CDC flagged (namely, HIV, heart disease, diabetes, or lung disease).  Comu is no more likely to contract COVID-19 than any other healthy middle-aged male in the United States.[9]

Comu also relies on a "joint statement" signed by Dallas County District Attorney John Creuzot to argue that the DA favors the immediate release of detainees, like the Defendant.  (ECF No. 253 at 7, n. 15, 23, 24.)  The "joint statement" is not relevant here – it is not binding on this Court and does not set forth the criteria relevant to the Court's resolution of Comu's motion.

In any event, the "joint statement" does not support Comu's argument for release; rather, it rebuts it.  According to the "joint statement," local officials should identify and release the following people immediately, unless doing so would pose a serious risk to the physical safety of the community: (i) individuals who are elderly; (ii) populations that the CDC has classified as

---

[8] *Coronavirus Disease 2019 (COVID-19), Are You at Higher Risk of Severe Illness?*, CDC, available at https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/high-risk-complications/older-adults.html ("Older Adults, 65 Years and Older, Are at Higher Risk for Severe Illness."); see also *id.* at https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/high-risk-complications.html.

[9] In addition to his age, Comu claims he has "significant recent health issues," that put him at risk.  (ECF No. 253 at 11.)  He does not elaborate or provide any evidence from a qualified medical professional who is familiar with Comu's current health situation.  Just as with his unsubstantiated claim that immediate release was necessary for treating his eye, the Court should not credit more unsubstantiated claims about Comu's health, where the only source appears to be Comu himself.

vulnerable (those with asthma, cancer, heart disease, lung disease, and diabetes); (iii) people in local jails who are within 6 months of completing their sentence; and (iv) people incarcerated due to technical violations of probation and parole.[10]

Comu is none of these things and fits squarely within the category of defendants who do not qualify for immediate release. Comu is neither elderly nor vulnerable; rather, he is middle-aged and healthy. Comu is not within six months of completing his sentence; rather, he is just beginning what is likely to be a lengthy sentence. Moreover, Comu is not incarcerated due to a "technical violation" of his conditions of release; rather, "[t]he Court reject[ed] any characterization of Defendant's violation as merely technical." (ECF No. 136 at 5.) In addition, both the Magistrate Court and District Court found that Comu poses a risk of harm to the community, including specifically to elderly victims (who Defendant has repeatedly targeted). As explained above, were Comu to be released in the midst of the COVID-19 pandemic, the risk Comu poses to elderly and other vulnerable victims would be even greater than before.

Comu also relies on an article reporting on Collin County Sheriff Jim Skinner's request that local police departments keep "petty criminals" out of jail to stop the spread of the coronavirus. (ECF No. 253 at 8, n. 30.) Rather than supporting Comu's argument, this too demonstrates why he should not be released. Petty crimes, under Texas state law, include Class C misdemeanors, such as petty theft, simple assault, possession of drug paraphernalia, public intoxication, disorderly conduct and trespassing on public property. Comu is not a petty criminal. He pled guilty to 23 felony counts for repeatedly targeting and defrauding hundreds of unsuspecting elderly victims

---

[10] *Joint Statement from Elected Prosecutors on COVID-19 and Addressing the Rights and Needs of Those in Custody* (Mar. 2020), at 3, available at https://fairandjustprosecution.org/wp-content/uploads/2020/03/Coronavirus-Sign-On-Letter.pdf.

out of millions of dollars, and is potentially facing decades of imprisonment for his serious crimes. Moreover, his suggestion that his crimes are "petty" does not weigh in favor of his temporary release; rather, it weighs against release because it reflects his personal failure to accept responsibility for his crimes and suggests that, if released, he is likely to continue committing crimes against the elderly (as he has attempted to do since his arrest in this case).

> **B.     The Defendant Fails to Meet His Burden to Demonstrate that Immediate Release Is "Necessary" to Prepare for a Sentencing Hearing at Least Four Month Away.**

As an alternative basis, Comu argues that, if he is not released immediately, it will be "impossible" for him to participate in preparations for his sentencing hearing, which is at least four months away. (ECF No. 253 at 12-14.)  According to Comu, his counsel is no longer willing to visit him in person out of fear they may be exposed to COVID-19 at the facility where he is being detained. (*Id.*)  Comu falls far short of his burden to show he is entitled to release on this basis and the Court should reject Comu's argument and deny his motion.

Courts considering whether release is "necessary" for the preparation of a defense have considered the time and opportunity the defendant has been afforded to prepare and participate in preparation, the complexity of the case, the volume of information, and the expense and inconvenience of preparing. *See, e.g.*, *Dupree*, 833 F. Supp. 2d at 248-50; *United States v. Buswell*, Crim. No. 11-cr-198, 2013 WL 210899, at *6-7 (W.D. La. Jan. 18, 2013).  The mere fact that release may make preparation more convenient, however, does not render release "necessary" as required by the statute. *See Dupree*, 833 F. Supp. 2d at 248; *United States v. Bararia*, 2013 WL 1907782, at *5 (D. Nev. Mar. 12, 2013) ("Discovery may be made marginally more difficult by the fact that [the defendant] is incarcerated.  The same can be said in every case where the

defendant is detained pending trial. Ultimately, the case is noncomplex and, other than some inconvenience, there is no valid reason to release . . . pursuant to Section 3142(i).").

Here, Comu has already had nearly eleven months to meet with his counsel in person to prepare his defense, to review discovery, and to consider the factual and legal issues likely to arise at sentencing. Assuming his counsel is unwilling to continue to meet with him in person at Dallas County Jail, Comu has another four months to prepare and participate in preparation for his sentencing hearing by telephone and through video visitation, which Dallas County Jail is making available to detainees at no cost. Comu does not offer a single fact, reason, or assertion to demonstrate: (i) why he has an urgent need to meet with his counsel – in person – to participate in preparation for a sentencing hearing that is at least four months away (and may very well be continued); and (ii) why, after eleven months of in person meetings with his counsel, telephonic and video conferencing is insufficient to allow him to continue to participate in preparation for the sentencing hearing. Having offered no reason that his release is "necessary" to prepare for his sentencing, Comu cannot be deemed to have met his burden under Section 3142(i).

The facts in this case are therefore very different than in *United States v. Stephens*, 15-cr-95-AJN, 2020 WL 1295155 (S.D.N.Y., Mar. 19, 2020), on which Defendant relies. In *Stephens*, the defendant was arrested while on supervised release on February 6, 2020, for new offenses, and brought into federal custody in early March 2020 on a warrant for violating his supervised release. Crim. No. 15-cr-95, ECF No. 2770, at 1. While being held in anticipation of a violation of supervised release hearing on March 25, 2020, the defendant petitioned for temporary release on March 16, 2020, arguing, in part, that release was necessary due to the risks of COVID-19. The court found a compelling reason for temporary release because of the specific obstacles the outbreak created for the defendant's preparation in the short period before his supervised release

17

hearing. 2020 WL 1295155 at *3. Specifically, the court found that defense counsel not only was barred from visiting the defendant because of restrictions put in place to combat COVID-19, but had been unable to reach him by phone. *Id*. Comu cannot credibly claim he is similarly situated to someone preparing for a hearing when they only learned about the topic of the hearing six weeks earlier, in the middle of the pandemic.

Moreover, unlike the defendant in *Stephens*, where the Court found "the strength of the primary evidence relied upon by the Government to demonstrate the danger the defendant poses to the community has been undermined by new information not available . . . at the time of [the prior detention] hearing," *id*. at *1, Comu has offered nothing to "undermine" the Court's initial conclusion regarding detention. To the contrary, Comu has pled guilty to all 23 felony counts charged in the superseding indictment and is now awaiting sentencing.

Finally, as with his broad claims that the mere existence of COVID-19 is sufficient alone to justify release, awarding Comu release on his thin claims of needing to prepare would cause the Court to be flooded with similar, generic requests on this same ground. In light of the fact that BOP has generally placed a 30-day hold on legal visits (with only some special exceptions), each defendant would claim that the need to confer with counsel is urgent and justifies relief— regardless of when that defendant's next hearing is scheduled or the nature of his or her appearance.

**CONCLUSION**

For these reasons, the government respectfully asks the Court to deny Comu's motion.

        Respectfully submitted,

        ROBERT ZINK
        CHIEF, FRAUD SECTION
        Criminal Division, U.S. Department of Justice

        <u>//s// Christopher Fenton</u>
        CHRISTOPHER FENTON
        Trial Attorney
        Christopher.Fenton@usdoj.gov
        AMANDA R. VAUGHN
        Trial Attorney
        Amanda.Vaughn@usdoj.gov
        Fraud Section, Criminal Division
        United States Department of Justice
        1400 New York Avenue, NW
        Washington, D.C. 20005
        Telephone: (202) 514-0561
        Fax: (202) 514-0152

        ERIN NEALY COX
        UNITED STATES ATTORNEY

        Mary Walters
        Assistant United States Attorney
        Texas State Bar No. 24003138
        1100 Commerce Street, Third Floor
        Dallas, Texas 75242-1699
        Telephone:  214-659-8600
        Facsimile:  214-659-8812
        Email:  mary.walters@usdoj.gov

## **CERTIFICATE OF SERVICE**

I certify that on March 23, 2020, I filed this response with the clerk of court for the U.S. District Court, Northern District of Texas via ECF.

//s// Christopher Fenton
Christopher Fenton
Trial Attorney
